[Cite as *Maumee v. Yeager*, 2024-Ohio-858.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Maumee               Court of Appeals No.  L-22-1260

    Appellee                                Trial Court No.  22CRB00342

v.

John P. Yeager                             **DECISION AND JUDGMENT**

    Appellant                               Decided:  March 8, 2024

* * * * *

Daniel C. Arnold, City of Maumee Prosecuting Attorney, for appellee.

Donald Gallick, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal filed by appellant, John Yeager, from the December 1, 2022 judgment of the Maumee Municipal Court.  For the reasons that follow, we affirm Yeager's conviction, but remand the matter to the trial court for the issuance of a nunc pro tunc entry consistent with this opinion.

**{¶ 2}** Yeager sets forth two assignments of error:

1. Appellant suffered a denial of due process when the trial court failed to issue a verdict after his bench trial, and erroneously filed two journal entries stating appellant entered a no contest plea.

2. The conviction is against the manifest weight of the evidence because the state failed to prove appellant was not acting in self-defense of himself and his daughter.[1]

## Background

**{¶ 3}** On the afternoon of May 19, 2022, Sidonian Tree Service ("STS"), was removing a tree from residential property ("the property") on Eastfield Drive ("the street") in Maumee, Ohio. To accomplish this task, STS's co-owner, J.C., and his crew were working on the property and in the street in front of the property, using several pieces of equipment which partially obstructed the street.

**{¶ 4}** Yeager was driving his vehicle, with his daughter as passenger, when he turned onto the street and encountered J.C. and equipment in the street. Yeager attempted to drive through the work area, but was stopped by J.C. and words were exchanged between the men. Yeager then drove through the work area and a physical altercation occurred between him and J.C. Police were called and responded to the scene

---

[1] We will refer to Yeager's actions of both self-defense and defense of his daughter as self-defense for the remainder of this opinion.

of the incident. Yeager was charged with assault of J.C., a first-degree misdemeanor; he pled not guilty and filed a notice of self-defense.

{¶ 5} A bench trial was held in Maumee Municipal Court, and six witnesses testified. At the end of the trial, the judge announced "[b]ased on the evidence presented today * * * I find the defendant guilty of assault, which is a violation of 2903.013(A) [sic, R.C. 2903.13(A)], and which is a misdemeanor of the first degree." The court issued a judgment entry which indicated that Yeager pled "NC" (no contest), and was sentenced to 180 days in jail, suspended, and inactive probation for one year, and he was ordered to pay a $250.00 fine and court costs. Yeager appealed.

{¶ 6} We remanded the matter for want of a final order, pursuant to Crim.R. 32.1, and on December 1, 2022, the trial court issued a nunc pro tunc entry which set forth, inter alia, that "Yeager * * * entered a plea of No Contest to the charge of Assault[.] * * * The Court accepted his plea and made a finding of Guilty." Yeager appealed.

{¶ 7} Before we address Yeager's assigned errors, we will provide a summary of the witnesses' trial testimony, in the order the witnesses were called at trial.

**J.C.'s Version of Events**

{¶ 8} J.C. is a combat veteran and 6' or 6'2" tall. On the day of the incident, he and his crew were removing a large tree from the back of the property, and a 50-ton or 90-ton crane with "an exceptionally large boom" was set up on the driveway of the property. Due to other trees on the property and in the neighbor's yard, J.C. and his crew

3.

had to swing a large piece of the tree out into the street to drop it and process it. To process a tree, he cut apart all of the limbs which fit in the chipper, and put the bigger parts of the tree into a log dump truck. The chipper was on the street.

{¶ 9} To deter and slow down traffic on the street, cones were placed on each side of the block, in the oncoming lane of travel. When the crane came in carrying wood to be processed in the street, J.C. put his skid steer loader[2] ("loader") in the middle of the street to completely block off traffic. Processing took a few minutes, and then there was a period of about five minutes before the crane came in again.

{¶ 10} Other cars had driven through the street "during the times of low activity," but during periods of high activity, every other car passed the street or turned around, and no one other than Yeager gave J.C. grief. Drivers knew it was safe to drive through the work area when J.C. would make eye contact with the drivers or wave them on, after J.C. had moved the impediments in the street out of the way.

{¶ 11} Just prior to the incident, J.C. had put his loader in the middle of the street to block traffic and send the message that "it's dangerous here, don't come down [the street] currently." J.C. was wearing, inter alia, a high-visibility t-shirt and a large backpack blower which weighed 35 to 40 pounds. He was using the blower in the street when he saw, out of the corner of his eye, that a car had driven past the cone and "was starting to aim to squeeze between my chip truck and the [loader]." J.C. gave a "passive

_____

[2] A skid steer loader is a piece of machinery used to lift heavy objects and it is approximately three feet wide and six feet long.

4.

wave with the bottom of [his] hand to go on * * * like get out of here motion" to the driver, Yeager, while J.C. kept his eyes on the wood being carried by the crane.

{¶ 12} When it was clear that Yeager was going to attempt to drive through the active work site, J.C. stopped watching the incoming wood on the crane, and approached the car. J.C. motioned for Yeager to roll down the window and "kept things professional" when he asked Yeager why he ignored the cone and was trying to drive through the active job site. Yeager "kind of hostilely" asked if J.C. had a permit "[b]lah, blah, blah," to which J.C. replied he did not need a permit, he had cones and was directing traffic. J.C. requested that Yeager go around the block, but Yeager said he did not know where to go and would get lost, so J.C. gave directions. Yeager continued "to rail on about you should have a permit. And at this point he's yelling" at J.C.

{¶ 13} It was clear to J.C. "that I was not going to be able to reason with this guy[,] [s]o, at that point, I disengaged with [Yeager]." J.C. stepped away, intending to walk to the loader to turn it "to completely block the [street] as this large 2,000-pound piece of wood is coming in from above," but when he walked in front of Yeager's car "he floored it," took J.C. out at the knees, and slammed J.C. onto the car's hood.

{¶ 14} It took J.C "a second to gather [his] bearings," then he stood up on the hood and tried to figure out what to do because he had never planned for this situation. He did not want to go to the front of the car since Yeager had already floored it and took J.C. out at the knees. J.C. thought if he jumped to either side, there was a good chance he would

5.

get pinched between Yeager's car and the wooder chipper or Yeager's car and the [loader]. J.C. "saw no safe exit from the hood * * * because [Yeager] just demonstrated that he's crazy enough to hit a guy just trying to keep him safe from going onto this active job site with, you know, a 2,000-pound log overhead."

{¶ 15} J.C. was standing on the hood and "did a couple circles around trying to figure out" what to do. Yeager floored it again, which slammed J.C. onto the roof of the car, laying on his belly. Yeager did not let up from the accelerator and was going pretty fast for a while, so J.C. looked for something to hold onto because if Yeager "kept going at this speed, down the [street] he's going to take a turn." J.C. still had the backpack blower on, which he "could feel was making me want to roll off the car," and he knew if the car turned, he would not have control of how he landed. J.C. grabbed onto the little nubby car antenna with one hand and searched for a crevice to grab onto with the other hand "and hopefully live through this."

{¶ 16} Yeager then slammed on the brakes, which threw J.C. off of the car. J.C. landed on his feet in front of the car, stepped over to the right side of the street on the grassy curb area, took off the blower and realized that Yeager had gotten out of his car and was running from the car yelling and screaming about J.C. denting his car. Yeager "came running up to [J.C.]," punched him in the ear and then persisted "to come at [J.C.] trying to attack [him]." Yeager "swung multiple more times," J.C. was able to push him away, but Yeager "repeatedly came at [J.C.], fist-ball swinging."

6.

{¶ 17} J.C.'s employee, Josh Shoemaker, came running up because Yeager kept coming at J.C., and at that point J.C. was losing his patience and had started "balling a fist." Josh yelled at J.C., "don't, it's not worth it," then Yeager "turned towards Josh and swung a punch at Josh," but missed. Josh told Yeager to calm down and Yeager kind of backed away. Yeager took out his phone and held it about two inches from J.C.'s face. J.C. told him to get away but Yeager repeatedly held up the phone to antagonize J.C. After that, the people who had gathered to watch the incident left, and Yeager got in his car and drove up the street.

{¶ 18} An ambulance arrived, but J.C. did not want to go because it had been a slow summer and he wanted to finish the tree job and get paid. J.C.'s knees, where he was hit by Yeager's car, were "messed up all summer."

{¶ 19} On cross-examination, J.C. was asked why he did not slide off of the side of the car rather than standing and stomping around on the car, and J.C. replied, "[H]e had already hit me. And there was machinery on either side of the car. So if he chose to rip off again * * * I was in fear for my life because I would have been pinched between his car and machinery. I didn't want to be became a hamburger that day." Yeager "was trying to thread a needle, like, there was barely enough room for a car to go through."

{¶ 20} When J.C. was asked if he had consumed any alcoholic beverages that day or taken any street drugs or prescription medication, he replied, "No. * * * This job is way too dangerous to do anything but 100 percent sober and focused. * * * I don't mess

7.

around with it. It's someone's life if I do." J.C. denied using profanity when he initially approached Yeager to ask why he was ignoring the cones and trying to drive through the active work site. J.C. may have been swearing at Yeager after the fact, but J.C. did not threaten Yeager or swing at him.

{¶ 21} J.C. was asked if Yeager hit him in the ear, why was there no mark, as noted in the police report, which stated the officers did not see any visible injuries. J.C. responded, "I had a slight little red mark on my ear" and "an injury is different than a mark."

**Joshua Shoemaker's Version of Events**

{¶ 22} On the day of the incident, Josh was working on taking down a tree with his brother, who is the other co-owner of STS, J.C. and another person, who was operating the crane. There were cones on the street as well as STS's trucks and the loader, so the trees could be processed. Josh was in the street, helping to take the trees from the crane and J.C was about 20 to 30 feet away. Josh did not see any cars go through the work area that day. He saw J.C. talking to a driver (Yeager) who was stopped at a cone, then J.C. started to walk, passing in front of Yeager's vehicle, when Yeager "floored it, hit [J.C.]." J.C., who had a "30-pound jet pack on his back," landed on the hood of the car and was "scrambling to hold on * * * he was just trying not to get killed." Josh did not see J.C. standing on the car, just scrambling. Next, Yeager slammed on the brakes, J.C. "went flying off" and landed on the ground, somewhere in

8.

front of the car. As Josh was running over, Yeager got out of his car and J.C. took off his backpack. J.C. might have been swearing, but "who wouldn't?" Josh tried to separate the men when "somehow this guy [Yeager] still managed to hit [J.C.] in the left side of the face." J.C. did not swing at Yeager, because "if [J.C.] would have swung, he would have hit [Yeager]."

{¶ 23} Josh was asked how many times Yeager swung at J.C., and he said, "I mean, he just kept coming at him. He wouldn't stop. He swung at me." Josh called 911, and broke up the two men. Yeager got into his car, started videotaping and drove off.

**Norman Szymkowiak's Version of Events**

{¶ 24} Norman owns a landscaping company. On the day of the incident, has was on the street working in a front yard, near to where a tree service (STS) was working. He had never seen STS before. He saw "a car came passed the truck that had the crane, and a gentleman from the tree company was on the hood." Norman did not see J.C. actually get hit by the car.

{¶ 25} "The guy [Yeager] stopped, he [J.C.] came off. [Yeager] came out of the car, and took a swing and hit [J.C.] * * * I think it was in the left side * * * [in the jaw]. And [J.C.] tried to block it." By that time, Norman had gone over and was next to the men, telling them to stop and settle down, but Yeager "just kept on and on and on." Yeager "kept cussing at [J.C.] and telling him you're on my car, you put a dent in it. And [J.C.] said you hit me, you hit me." Norman said it was not a fight, because J.C. was just

9.

trying to block the punches being thrown, but tempers were flaring on both sides. After the situation calmed down, Yeager got in his car, drove down the street and parked.

{¶ 26} Norman did not know how J.C. landed when he came off of the car as everything happened so quickly. He thought J.C.'s backpack came off of him when he slid off of the car. Norman did not know any of the people involved in the incident.

**Taylor Bolton's Version of Events**

{¶ 27} Taylor is a crew leader for Norman's landscaping company and was working on the street on the day of the incident, when he noticed people cutting down trees. He did not know the people, but they notified his crew that the street was closed off because large trees were being brought over, and they advised the crew to be very careful.

{¶ 28} Out of nowhere, Taylor saw "a guy [Yeager] ran over the other guy [J.C.] * * * [and J.C. with his leaf blower] was on the hood of the car * * * on his back like a turtle almost." Taylor estimated the car drove about a hundred feet. J.C. then stood on the hood saying you ran over me motherf#%$. "He [Yeager] was yelling, screaming, lots of get off my car, get off my car." J.C. "popped off" of the car yelling that Yeager was in the "wrong, we have cones out here for a reason, you're not supposed to go this way." J.C. took his backpack off and Yeager "got out of his car, came out, * * * got in [J.C.'s] face * * * and punched [J.C.]." This occurred in the front of Yeager's car.

10.

{¶ 29} Taylor did not see or hear J.C. threaten Yeager. Taylor did not see J.C. punch back, he was "defending, putting his hands up, defending." People were yelling to call the police; Yeager "got back in his car and left before the police were called."

**Daughter's Version of Events**

{¶ 30} Yeager's daughter is 21 years old. On the day of the incident, she was in a car with her dad with him driving, headed for home. She lived at the home her whole life, but did not currently live there. When their car pulled onto the street, "we saw a man [J.C.]* * * blowing debris off the street. So we just waited * * * maybe a minute or so passed. Me and my dad were just calmly waiting for him to finish his job. And then [J.C.] kind of fastly walked to my dad's car and asked why does everyone keep trying to go pass [the street], can't they see I'm working or something to that effect." Her dad asked if J.C. had a permit "and then it kind of escalated from there."

{¶ 31} She believed J.C. walked behind the chipper, and her dad inched forward. Her dad had closed his car window to try to deescalate the situation. She felt threatened because [J.C.] "was very angry." All of a sudden, J.C. "rolled on top" of the car. She was very scared and "saw, like, a -- it was very fast, but I saw, like, a body on the vehicle, and then he went up to the top of the car, I think." Her dad accelerated with J.C. on top of the car, then J.C. jumped down, "went to the side of the grass, threw off his backpack." Her dad got out of the car and J.C. started walking and "kind of charged" her dad. She was very nervous, scared and her heart was racing because "there was this man that was

charging our car -- or my dad. * * * I couldn't predict what was going to happen next." She was in fear for her dad's safety. Her dad took a swing at J.C. - she saw her dad throw only one punch - she did not see J.C. throw a punch. There was a verbal exchange and some of J.C.'s co-workers came over. Her dad then drove to the end of the street.

{¶ 32} On cross-examination, she was asked if there was another way home and she replied, "we were going to back up, and my dad -- but there was actually a truck behind us * * * [s]o we couldn't back up at that time. So we were all just waiting for [J.C.] to finish. And there wasn't any indication that we shouldn't have gone that way, so." She did not see anything blocking the street.

{¶ 33} She said J.C. came up to the driver's side of the car yelling, and "he's the one that started this exchange, and he came up to him very angrily and asked why is everyone trying to come -- can't they see I'm trying working here." She thought her dad was inching the car forward "trying to deescalate the situation, and just take the highroad [sic] and roll up his window and just say okay."

{¶ 34} She was asked how J.C. got onto the car and she said, "I think he -- well, we were inching forward, and then he was behind the wood chipper. He was never, at any point, in front of the car * * * so it wouldn't make any sense that that would happen." She said "he, like, rolled on top of the car like kind of jumped on -- which was the driver's side * * * [and landed] [o]n his side, I believe." Her dad accelerated forward "a little bit * * * stopped the car, and then [J.C.] jumped down on both of his feet."

12.

{¶ 35} When asked if J.C. came over to the driver's side door when her dad got out of the car, she did not recall. She did not believe that J.C. came over to her door. Her dad yelled at J.C. "why did you jump on top of my car * * * [w]hy were you charging me?

**Yeager's Version of Events**

{¶ 36} Yeager was retired from the Air Force, with 20 years of service, and was now working as a truck driver. On the day of the incident, he was driving home with his daughter when he turned onto the street and saw a tree service truck parked on the left side of the street. "There was nothing there to indicate that the [street] was closed. Nothing, absolutely." He pulled up and "kind of stopped in the middle of the truck somewhere." He saw J.C. "far down the [street] * * * blowing with his blower * * * and [the loader] wasn't on the [street], but it was passed the chipper, and it was almost hugging the right side of the [street] * * * maybe a foot between the curb and the [loader]. I looked at it and I had plenty of room to go through there."

{¶ 37} Yeager had lived there his whole life and could have taken another road, but there was a vehicle behind him, so he waited until J.C. "ends up behind the chipper. I can't see him from my vantage point. * * * So I start * * * to go. Then, [J.C.] as fast as I seen anyone move, he comes out from behind the chipper, and he is positioned between * * * my driver's door and the passenger door of my car." J.C. leaned over, Yeager rolled down his window a bit, and asked J.C. what was going on. J.C. "says, why in the eff is

13.

everyone passing me? Can't you see the [street] is closed?" Yeager said "the [street's] not closed. There's nothing * * * there blocking it. Don't you need a sign? Don't you need a permit?" J.C. "was very agitated when he came to my window * * * he was yelling at me, can't you see we got crane operations going on here? It's dangerous."

{¶ 38} Yeager wanted to leave as "the situation is escalating. So as I was rolling up my window, I put it in drive and started to go * * * [J.C.] ran -- I don't want to say ran, maybe he sped walk, but it was really quick, to the front * * * left quarter panel on my car. It was almost like a high jump, he just kind of rolled on top of my car." Yeager "went to hit the brake and accidentally hit the gas. And I was * * * like is this guy high?" Yeager explained that J.C. "rolled up, and when I accelerated, he * * * was on the windshield, and then on top of the car." Yeager "sped forward," then stopped and "when [J.C.] was on top of my car, I got out, * * * I started to walk toward the front of my car, [J.C.] stood up * * * it's kind of like he stomped on my hood. In one jump he got down on the ground. * * * I'm coming around, and he goes to my passenger side. And he looks at my daughter. I'm like this guy is going to kill me -- kill my daughter."

{¶ 39} Yeager saw J.C. "put the backpack down. He charged me, and I took a swing at him, and then he got in my face and he's like come on motherfucker -- or come on MFer, hit me, hit, come on hit me." Yeager was in fear when he threw the punch, his intent was to protect his daughter; he did not believe he connected with J.C.'s face. Josh, J.C.'s worker, got in between Yeager and J.C., and the situation calmed down.

14.

{¶ 40} On cross-examination, Yeager testified that when he turned onto the street, he "saw the truck and the [loader] was up ahead. Other than that, there was nothing in the [street]." He was asked if the loader and truck indicated it was a work site, he said "Uh-huh." He was then asked if he normally drove through work sites, and he said, "Depend -- it depends. The [street] wasn't closed. And I waited until he was off -- I couldn't see him after he was done." Yeager admitted he asked J.C. if he had a permit "[b]ecause we've -- you have to have a permit to close the [street]."

{¶ 41} Yeager said that after he stopped the car and got out, J.C. "jumped on the ground, went over [to the] grass. That's when he dropped his backpack and charged me." Yeager later said when J.C. "took the backpack off, he glanced at my daughter, and that's when I'm like he's going to kill us both." When Yeager was asked why he thought J.C. was going to kill him, he replied, "Well, he was -- he was cussing at me. His face was like -- it was just like -- and then I did cuss at him a couple of times. He cussed at me."

{¶ 42} Yeager was asked, "So you were afraid [J.C.] was going to kill you * * * [and] your daughter. Why was your concern about the dents on the car?" Yeager replied, "He was -- after we had done that, he was why did you hit me * * *?" Yeager agreed he told the police that his car was damaged by J.C. Yeager was questioned about why he failed to tell the police he was afraid for his life and scared for his daughter's safety, and he replied, "You know, at the time, I couldn't believe that when the officer first -- first came to me, you know, he's -- he's doing -- he says -- I told him the whole story." The

15.

officer told Yeager he "needed to watch out for people in the [street]. I'm like he wasn't there. He had -- he was behind the chipper. And the guy jumps on the car and none of the police officers were saying, well, he jumped on your car. * * * So I was -- I was still wound up. I was scared. I was -- I can't believe that they weren't -- they're saying you took a swing at him. I'm like but he jumped on my car * * * I was afraid."

{¶ 43} Yeager was asked why he would get out of his car if he was afraid, and he said, "Because if something is going -- if someone jumped on the car is going to attack me, what am I going to do? Just let him -- let him throw a punch at my daughter?" Yeager was asked why he did not get out of the situation rather than put himself into the situation by getting out of the car and confronting the guy he thought was on drugs or going to kill him, and Yeager responded, "Um. * * * (No audible response.)."

## First Assignment of Error

{¶ 44} Yeager sets forth two distinct reasons why he insists that he was denied due process: the trial court's incorrect and incomplete judgment, and the court's failure to consider his self-defense claim.

### Due Process - Incorrect and Incomplete Judgment

{¶ 45} Yeager argues he was denied due process when the court failed to issue a verdict after the bench trial and filed two entries which set forth that he entered a no contest plea. He asserts a "Criminal Rule 12.1 notice of self-defense" was filed before the bench trial, but at the conclusion of trial, the judge announced a one sentence verdict

that "defendant [is] guilty of assault, * * * which is a misdemeanor." Yeager submits there was no mention of his self-defense claim nor an evaluation of any evidence or witnesses in the first entry. He appealed for want of a final order, and we remanded.

{¶ 46} Yeager notes the trial court, in its December 1, 2022 nunc pro tunc entry, set forth that he entered a no contest plea to the assault charge. He realizes this second entry comports with Crim.R. 32.1, but argues the entry fails to address his self-defense claim and not does acknowledge a bench trial was held. He maintains that appellate courts have vacated journal entries for misstating, in open court, a criminal sentence, and have vacated and remanded final orders when the trial court misstates the law. He cites to "*State v. Frank McMillen*, 92-LW-5151, (Ohio App. 8. Dist. Oct. 15, 1992)" and "*In re Estate of Usiak*, 172 Ohio App.3d 262, 268."[3]

{¶ 47} The state concedes the trial court's entry is incorrect as it states a finding of guilty was made after a no contest plea, but the state claims it was a clerical error which can be cured by remanding the matter to the trial court for the limited purpose of entering a nunc pro tunc entry. In support, the state cites to, inter alia, Crim.R. 36.

---

[3] These citations do not comply with Loc.R. 10(C) of the Sixth District Court of Appeals, which states "[c]ase citations * * * must include * * * the particular page or paragraph number where the point of law is found. Citations shall conform to the Writing Manual A Guide to Citations, Style, and Judicial Opinion Writing issued by the Supreme Court of Ohio (2013)."

17.

**Due Process - Failure to Consider**

{¶ 48} Yeager argues he was denied due process when the court failed to consider self-defense and failed to find the state disproved self-defense beyond a reasonable doubt. He observes that a criminal defendant has a constitutional right under the Due Process Clause to be heard in a meaningful and timely manner, but asserts that his "right to self-defense was not heard by the [trial] court, nor was it considered and decided by that court." He submits his conviction should be vacated and remanded with instructions to the trial court to consider his "right to self-defense."

## Law - Due Process - Incorrect and Incomplete Judgment

{¶ 49} The constitutional right to due process requires, inter alia, notice and the chance to be heard before the state can deprive a person of "life, liberty, or property." *See* Fourteenth Amendment to the U.S. Constitution; Ohio Constitution, Article I, Section 1; and *State v. Hayden*, 96 Ohio St.3d 211, 212, 773 N.E.2d 502 (2002).

**Bench Trial - Findings/Judgments**

{¶ 50} R.C. 2938.11(F) provides in pertinent part that "[a]ny * * * finding determined by the judge * * * in trial to the court, shall be announced and received only in open court as soon as it is determined." And, Crim.R. 23(C) states that "[i]n a case tried without a jury the court shall make a general finding."

{¶ 51} Crim.R. 32(C) states in pertinent part, that "[a] judgment of conviction shall set forth the fact of conviction and the sentence."

18.

**Mistakes/Nunc Pro Tunc Entry**

{¶ 52} Crim.R. 36 provides that "[c]lerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time."

{¶ 53} A clerical mistake is an error or omission, which is mechanical in nature and apparent on the record and does not involve a legal decision or judgment. *State ex rel. Allen v. Goulding*, 156 Ohio St.3d 337, 2019-Ohio-858, 126 N.E.3d 1104, ¶ 11. A nunc pro tunc entry is the proper way to correct the record. *State ex rel. Womack v. Marsh*, 128 Ohio St.3d 303, 2011-Ohio-229, 943 N.E.2d 1010, ¶ 13.

{¶ 54} In *State v. Stultz*, 9th Dist. Lorain No. 20CA011625, 2023-Ohio-4754, ¶ 23, the appellate court noted Stultz pled not guilty and a bench trial was held, but the trial court's entry indicated he pled guilty. The matter was remanded so the trial court could issue a nunc pro tunc entry to correct the previous, erroneous entry. *Id.*

{¶ 55} In *State v. Howe*, 6th Dist. Fulton No. F-20-008, 2021-Ohio-1676, Howe entered a no contest plea but the trial court's entry designated the manner of conviction as a guilty plea. *Id.* at ¶ 1, 16. Howe challenged the error under Crim.R. 32(C), and while we noted the current version of the rule does not require "that the judgment entry specify the specific manner of conviction," we recognized that a trial court speaks through its journal entry and may correct a clerical error in its entry at any time so the entry conforms to the transcript of proceedings. *Id.* at ¶ 15, 16. We remanded the matter for

19.

the trial court to issue a nunc pro tunc entry to accurately reflect that Howe entered a no contest plea. *Id.*

**Cases Cited by Yeager**

{¶ 56} In *State v. McMillen*, 8th Dist. Cuyahoga No. 61090, 1992 WL 292259, *5 (Oct. 15, 1992), the appellate court noticed that the trial court's journal entry misstated the order given at the sentencing hearing. The appellate court, sua sponte, vacated the sentence and remanded the matter to the trial court for resentencing. *Id.*

{¶ 57} In *In re Estate of Usiak*, 172 Ohio App.3d 262, 2007-Ohio-3038, 874 N.E.2d 838 (7th Dist.), the appellate court noted that the probate court's journal entry misstated both Ohio law and the court's local rules regarding the posting of bond. *Id.* at ¶ 21. The court of appeals found that "[b]ased on the errors committed by the probate court and its staff in this case, the court's judgment is vacated." *Id.* at ¶ 52.

**Analysis**

{¶ 58} Yeager argues his due process rights were violated because the trial court failed to journalize that a bench trial was held, and failed to issue a full verdict. Yeager seeks to have his conviction vacated and his case remanded.

{¶ 59} Upon review of the record and the applicable law, we find the trial court complied with R.C. 2938.11(F) when it announced its finding, at the end of trial, that Yeager was guilty of assault. We further find that the trial court's November 23, 2022 judgment entry complies with Crim.R. 23(C), as it sets forth a general finding, and it

20.

complies with Crim.R. 32(C), as it sets forth the fact of conviction and the sentence. We do note that the trial court's entry sets forth an incorrect manner of conviction.

{¶ 60} In support of his request to have his conviction vacated and his case remanded, Yeager cites to *McMillen* and *In re Estate of Usiak*, which, upon review we find are distinguishable from his case. In *McMillen*, the appellate court vacated the sentence and remanded for resentencing due to a misstatement in the entry of the order given at the sentencing hearing. In *In re Estate of Usiak*, the appellate court vacated the judgment based on the many errors made by the probate court which included misstating the law in the entry.

{¶ 61} We find Yeager did not establish that the trial court's entry misstated his sentence or the law, such that his conviction should be vacated, nor did Yeager cite to any legal authority which requires that a conviction be vacated due to a misstatement in the entry of the manner of conviction. Therefore, we find no basis to vacate Yeager's conviction.

{¶ 62} Notwithstanding the foregoing, we find the trial court's judgment misstates the manner of Yeager's conviction, thus, pursuant to *Howe*, we remand the matter so the trial court can issue a nunc pro tunc entry which correctly reflects that a bench trial was held.

21.

## Law - Due Process - Failure to Consider

**Assault**

{¶ 63} R.C. 2903.13 sets forth in pertinent part:

(A) No person shall knowingly cause or attempt to cause physical harm to another * * *."

**Self-Defense**

{¶ 64} R.C. 2901.05 provides in relevant part:

Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for * * * self-defense [or] defense of another * * * [is set forth in] * * * (B)(1)[.]

(B)(1) A person is allowed to act in self-defense [or] defense of another * * * [i]f, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense [or] defense of another * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense [or] defense of another * * *.

{¶ 65} Self-defense is an affirmative defense whereby the defendant, in essence, admits to the facts of the state's case but offers additional facts that justify or excuse the defendant's use of force. *See State v. Poole*, 33 Ohio St.2d 18, 19-20, 294 N.E.2d 888 (1973). Hence, "the doctrine of self-defense has no application * * * [when] the record is devoid of evidence that [the defendant], out of concern for his safety, intended to [hit the victim]." *State v. Rogers*, 43 Ohio St.2d 28, 30-31, 330 N.E.2d 674 (1975).

{¶ 66} "The elements of self-defense differ depending upon whether the defendant, in defending himself, used deadly or non-deadly force." *In re N.K.*, 6th Dist. Sandusky No. S-21-001, 2021-Ohio-3858, 180 N.E.3d 78, ¶ 12. Deadly force is "any force that carries a substantial risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2). A "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). A single punch may not constitute deadly force. *State v. Triplett*, 192 Ohio App.3d 600, 2011-Ohio-816, 949 N.E.2d 1058, ¶ 14 (8th Dist.).

{¶ 67} To support a claim of self-defense involving the use of non-deadly force, the defendant must prove, by a preponderance of the evidence, that: (1) he was not at fault in creating the situation giving rise to the altercation; and (2) he had reasonable grounds to believe and an honest belief, even though mistaken, that he was in imminent danger of bodily harm and his only means to protect himself from such danger was by the

23.

use of force not likely to cause death or great bodily harm. *In re N.K.* at ¶ 14. To support a self-defense claim involving the use of deadly force, in addition to the foregoing, the defendant must also prove, by a preponderance of the evidence, that he did not violate any duty to retreat or avoid the danger. *Id.* at ¶ 13. Pursuant to R.C. 2901.09(B), a defendant does not have a duty to retreat so long as the defendant is in a place in which he lawfully has a right to be.

{¶ 68} "Ohio courts have 'long recognized that a person cannot provoke [an] assault or voluntarily enter an encounter and then claim a right of self-defense.'" *State v. Sturgill*, 12th Dist. Clermont No. CA2020-03-018, 2020-Ohio-6665, ¶ 21, quoting *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002 WL 126973, *3 (Jan. 22, 2002).

{¶ 69} In *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, the Supreme Court of Ohio clarified a defendant's burden when asserting a self-defense claim under the version of R.C. 2901.05 which went into effect on March 28, 2019:

> [A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that [his] use of force was in self-defense. * * * [I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then [he]has satisfied the burden[.]

24.

*Id.* at ¶ 25.

**{¶ 70}** "The * * * 'evidence presented that tends to support' self-defense indicates that the defendant's burden of production is not a heavy one[.]" (Citation omitted.) *Id.* at ¶ 22. If the defendant "fails to meet its burden of production, the fact-finder cannot consider the [self-defense] claim at all[.]" *Id.* at ¶ 17. If the defendant meets the burden of production, then the state has the burden of disproving the defendant's self-defense claim, beyond a reasonable doubt. *Id.* at ¶ 27. The state satisfies its burden if it disproves "at least one of the elements of self-defense beyond a reasonable doubt." *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.

**The Record/Speculation/Bench Trial Presumption**

**{¶ 71}** App.R. 9(A)(1) provides that "[t]he original papers and exhibits thereto filed in the trial court, the transcript of proceedings, if any, including exhibits, and a certified copy of the docket and journal entries prepared by the clerk of the trial court shall constitute the record on appeal in all cases."

**{¶ 72}** "In a direct criminal appeal, this court's review is limited to evidence presented at trial; we cannot consider matters outside the record before us. [*State v.*] *Ishmail*, [54 Ohio St.2d 402, 377 N.E.2d 500 (1978)] at paragraph one of the syllabus. [*See also*] *State v. Cooperrider*[, 4 Ohio St.3d 226, 228, 448 N.E.2d 452] (1983) * * *." *State v. Davis*, 6th Dist. Lucas No. L-05-1056, 2006-Ohio-2350, ¶ 21. Thus, arguments which are not supported by factual evidence in the record are merely speculative

25.

assertions, and speculation is not a sufficient basis for an appellate argument. *See State v. Powell*, 8th Dist. Cuyahoga No. 107276, 2020-Ohio-3887, ¶ 37. Moreover, in a bench trial in a criminal case, the trial court is presumed to consider "only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968).

### Analysis

{¶ 73} Yeager argues his due process rights were violated because the trial court failed to hear and consider his self-defense claim and the court failed to find that the state disproved his claim of self-defense.

{¶ 74} At the outset, we recognize that the trial court did not overtly address, in its judgment entry, Yeager's claim of self-defense. However, we find, and the record shows, that the trial court was made aware of Yeager's self-defense claim, since a notice of self-defense was filed prior to trial and in Yeager's counsel's opening statement at trial, counsel stated Yeager "was acting in a defensive mode. I did file * * * a notice of self-defense in this case."

{¶ 75} We further find that Yeager had the opportunity to be heard on his self-defense claim, and specifically with respect to his burden of production, given that the trial transcript shows both Yeager and his daughter testified, on numerous occasions, that Yeager was acting in self-defense against J.C., whom they insisted, initiated the altercation.

26.

{¶ 76} We also find Yeager's assertion that the trial court failed to consider and decide his self-defense claim is based purely on speculation and conjecture, in view of the fact that six witnesses testified at the bench trial, which provided the court with, inter alia, evidence concerning the state's burden of disproving Yeager's self-defense claim. In addition, we presume that the trial court considered all of the relevant, material and competent evidence in reaching its decision on both the burden of production and the burden of persuasion, and we find nothing in the record to indicate that the court failed to consider Yeager's self-defense claim.

{¶ 77} Accordingly, we find Yeager's first assignment of error well-taken, in part.

## Second Assignment of Error

{¶ 78} Yeager argues that his conviction is against the manifest weight of the evidence as the state did not prove he was not acting in self-defense. He asserts when a criminal defendant claims self-defense, the state must disprove, beyond a reasonable doubt, that the defendant did not act in self-defense, pursuant to R.C. 2901.05(B). Yeager also contends that a defendant has the right to "'stand [his] ground,'" under R.C. 2901.09. He argues the trial court did not address either statute.

{¶ 79} Yeager cites to caselaw and portions of his and his daughter's trial testimony to support his claim that he acted in self-defense when he punched J.C. He offers that "[c]ommon sense suggests that J.C. initiated the incident by approaching Yeager's vehicle, screaming obscenities at Yeager, jumping up and down on [the] vehicle

27.

and jumping near Yeager's daughter. J.C. became angry when * * * lawfully and reasonably * * * asked if he had a permit and decided to direct his rage at Yeager and his daughter."

{¶ 80} Yeager insists he had a reasonable belief that his daughter was in danger. He argues that J.C.'s "charging the vehicle, screaming obscenities, jumping up and down on [the] car, and then leaping down near [Yeager's] daughter is a reasonable cause * * * to strike J.C. once in the side of the head."

{¶ 81} Yeager requests that this court "vacate the assault conviction and enter a not guilty verdict due to self-defense, or vacate the conviction and remand to the trial court with instructions to consider [R.C.] 2901.05(B) and [R.C.] 2901.09, and to issue a de novo verdict after considering [Yeager's] right to self-defense."

**State's Arguments**

{¶ 82} The state argues there were "two events" listed in the criminal complaint giving rise to the assault charge. The first event was Yeager striking J.C. with the car, and the second event was Yeager punching J.C. in the face after Yeager exited his car.

{¶ 83} The state asserts, with respect to the first event, J.C. essentially testified he was moving away from the driver's side of the car when he was struck by Yeager's rapidly accelerating car, while Yeager basically testified that after a verbal altercation, J.C. rolled onto the hood of the car and Yeager accidentally accelerated until he stopped the car and J.C. either rolled or jumped off of the car. The state argues, in either case,

28.

this testimony does not evoke the concept of self-defense as Yeager seemingly argues that what J.C. says happened, did in fact not happen.

{¶ 84} The state submits the only truly independent witness was Norman Szymkowiak, whose observations began just prior to the second event, when Yeager stopped the car and J.C. came off of the hood. Norman then saw Yeager run out of the car, charge at J.C., take a swing and punch J.C. in the left jaw. Norman also noticed Yeager take a few more swings at J.C., who was trying to block the punches and was not fighting or throwing punches himself.

{¶ 85} The state argues that what began as a verbal argument was escalated by Yeager when he accelerated his car and hit J.C., and even if Yeager's actions were accidental, he escalated the situation from verbal to physical when he exited his car from a position of safety, confronted J.C. and punched him. The state asserts Yeager's self-defense claim fails under either the deadly or non-deadly force standard, as both require that the defendant not be at fault in creating the situation giving rise to the affray.

**Standard of Review - Manifest Weight**

{¶ 86} In reviewing a manifest weight claim, the appellate court's function is to decide if the greater amount of credible evidence supports the verdict. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Weight of the evidence

29.

"'depends on its *effect in inducing belief*.'" (Citation omitted; emphasis sic.) *Thompkins* at 387.

{¶ 87} In *In re N.K.,* 2021-Ohio-3858, 180 N.E.3d 78 at ¶ 10, we set forth:

When determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the record, weigh the evidence and all reasonable inferences drawn from that evidence, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio-6048, 943 N.E.2d 1092, ¶ 48 (6th Dist.), citing *Thompkins* at 387 * * *.

{¶ 88} "It is fundamental that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). Thus, we must "extend special deference to the fact-finder's credibility determinations given that it is the finder of fact who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." (Citation omitted.) *State v. Tuggle*, 6th Dist. Lucas No. L-22-1298, 2023-Ohio-3965, ¶ 50. The appellate court sits as the "thirteenth juror" and scrutinizes how the finder of fact resolved conflicting evidence. *Thompkins* at 387.

30.

Reversal of a conviction on manifest weight of the evidence grounds should only occur in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id*.

**Analysis**

{¶ 89} Yeager argues his conviction is against the manifest weight of the evidence, as the state failed to prove he was not acting in self-defense. He asserts he had reasonable cause to strike J.C. once in the head, due to J.C. charging the car, screaming obscenities, jumping up and down on the car, and leaping down from the car near the daughter.

{¶ 90} Upon review, we note that Yeager never argued or offered evidence that he hit J.C. with his car. Rather, Yeager steadfastly maintained that J.C. jumped onto his car. As such, we find that Yeager has not taken the position that he acted in self-defense with respect to the actions involving his car (the first event set forth in the criminal complaint).

{¶ 91} We also observe that Yeager, in his amended brief, did not explicitly identify whether he used deadly or non-deadly force while acting in self-defense, as he set forth the standards for both. The state, in its amended brief, suggests the non-deadly force standard seems appropriate for Yeager's punch. We find, based on the record and the applicable law, the non-deadly force standard applies to Yeager punching J.C.

31.

**Evidence Regarding the Incident**

{¶ 92} The record includes the following evidence which is not disputed by Yeager and the state: Yeager was driving in his car with his daughter when he turned onto the street where J.C. was working and equipment was parked; Yeager stopped his car; there was a heated verbal exchange; J.C. informed Yeager there was a dangerous condition on the street; Yeager drove forward; J.C. was on the car; Yeager accelerated, stopped and got out of his car; J.C. was on the ground; a physical altercation occurred; Yeager punched J.C.

{¶ 93} The record includes the following disputed evidence as to whether: Yeager or J.C. created the situation which led to the physical altercation; J.C. rolled or jumped onto Yeager's car or Yeager hit J.C. with the car which propelled J.C. onto the car;[4] J.C. looked threateningly at the daughter or approached her side of the car after he jumped down from Yeager's vehicle; and Yeager charged or J.C. charged, which led to Yeager punching J.C.

**Yeager's Self-Defense Burden**

{¶ 94} Yeager had the burden of producing evidence which tended to support that he was not at fault in creating the situation which led to the physical interactions with J.C., and he had a bona fide belief that he and his daughter were in imminent danger of

---

[4] While Yeager does not claim or admit that he hit J.C. with his car in self-defense, Yeager does challenge the manifest weight of the evidence. Therefore, this contested evidence could be relevant to that challenge.

32.

bodily harm or death and the only way to escape the danger was to use force, and regarding the use of deadly force, he did not violate any duty to retreat or avoid the danger.

{¶ 95} Yeager produced as evidence his testimony and that of his daughter to support his version of events that J.C. provoked a verbal dispute with Yeager, which J.C. escalated into a dangerous situation by jumping or rolling onto Yeager's car, such that Yeager felt scared and compelled to protect himself and his daughter from J.C., by using non-deadly force to punch J.C. after J.C. charged Yeager.

{¶ 96} We conclude that the trial court, upon viewing this evidence and all reasonable inferences in the light most favorable to Yeager, could find all of the elements of a self-defense claim. Thus, Yeager met his burden.

**State's Self-Defense Burden**

{¶ 97} The state had the burden of disproving at least one of the elements of Yeager's self-defense claim, beyond a reasonable doubt. The state submits that Yeager was at fault in creating the situation giving rise to the affray.

{¶ 98} The state concedes, with respect to the first event which involved Yeager's car, the trial testimony does not evoke self-defense. As to the second event, the state recognizes that Yeager and J.C.'s testimony differs, but argues that Norman Szymkowiak, the only truly independent witness, testified that Yeager got out of the car,

33.

Yeager charged at J.C. and punched J.C. in the face, whereas J.C. was not throwing punches but was trying to block Yeager's punches.

{¶ 99} The state asserts the verbal argument was escalated by Yeager when he exited his car, from a position of safety, charged at J.C. and punched him.

**Findings**

{¶ 100} Upon review, we perceive that Yeager and his daughter offered numerous unlikely and/or inconsistent explanations in their trial testimony regarding: how much equipment was on the street; why Yeager continued to drive into the work area, despite warnings from J.C. that it was dangerous; how J.C., with a 30-40 pound blower on his back, got on the car - it was "like a high jump, he just kind of rolled on top of my car," or "he, like, rolled on top of the car like kind of jumped on" or "he didn't jump"; Yeager accelerated or accelerated "by accident" and "sped forward" with J.C. on the car; Yeager stopped the car and while fearful of J.C., Yeager got out of the car; after J.C. jumped off of the car, Yeager saw J.C. glance or look at his daughter, or approach the passenger side of the car, although the daughter did not believe J.C. did so; Yeager thought J.C. was going to kill him and/or his daughter because J.C. was cussing at Yeager; J.C. charged at Yeager and Yeager punched J.C., just one time with one swing.

{¶ 101} Conversely, we notice that the testimony of the state's witnesses was largely consistent and was not contradictory concerning what each witness observed and heard with respect to the following: the number and types of equipment on the street;

34.

there were cones or barriers on the street; how J.C., with a 30-40 pound blower on his back, was hit or struck by Yeager's car; Yeager accelerated and drove about a hundred feet with J.C. on the car before he stopped and J.C. came down from the car; Yeager got out of the car, J.C. removed his backpack blower then Yeager charged at J.C., swung and threw punches at J.C., and struck J.C. once in the head. None of the witnesses testified that they heard J.C. threaten Yeager or saw J.C. swing at Yeager.

{¶ 102} We have reviewed the record and the relevant law, weighed the evidence and all reasonable inferences, and considered the credibility of all of the witnesses. We find the record includes competent credible evidence which supports a finding that the state satisfied its burden of disproving, beyond a reasonable doubt, that Yeager did not provoke or create the situation which led to the physical altercation with J.C.

{¶ 103} We further find the record is lacking in any argument by Yeager that the manifest weight of the evidence supports a finding that he did not hit J.C. with his car, as Yeager offers conclusory statements that J.C. jumped on the car. Nonetheless, we have reviewed the record and the relevant law, weighed the evidence and all reasonable inferences, and considered the credibility of all of the witnesses. We find the record includes competent credible evidence which supports a finding that Yeager struck J.C. with his car.

{¶ 104} Upon this record, we cannot say this is the exceptional case where the trial court clearly lost its way in resolving evidentiary conflicts concerning Yeager's self-

35.

defense claim and Yeager hitting J.C. with his car, or created such a manifest miscarriage of justice such that Yeager's assault conviction must be reversed and a new trial ordered. The judge had the opportunity, and was in the best position, to view the witnesses, hear their versions of the events, note any inconsistencies, and accept or discount all or portions of their testimony. Accordingly, we find Yeager's second assignment of error not well-taken.

{¶ 105} On consideration whereof, the judgment of the Maumee Municipal Court is affirmed, in part, and this matter is remanded to the trial court for the limited purpose of issuing a nunc pro tunc entry which accurately reflects that Yeager was tried before the bench. Pursuant to App.R. 24, costs of this appeal are assessed to Yeager.

Judgment affirmed,
in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.         _____
                                              JUDGE
Myron C. Duhart, J.

Charles E. Sulek, P.J.         _____
CONCUR.                                 JUDGE

_____
                                              JUDGE

36.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.