[Cite as *State v. McClain*, 2025-Ohio-577.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                       Court of Appeals No.  L-24-1082

    Appellee                                    Trial Court No.  CR0202302649

v.

Dominique McClain                           **DECISION AND JUDGMENT**

    Appellant                                   Decided:  February 21, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** Following a jury trial, the defendant-appellant, Dominique McClain, was

convicted of felonious assault with a gun specification and sentenced to an indefinite

prison sentence of seven to ten-and-a-half years by the Lucas County Court of Common

Pleas.  For the following reasons, we reverse and vacate the costs of confinement but

affirm the judgment in all other respects.

**I.  Background**

**{¶ 2}** This case involves a shooting that occurred during an adult game of flag

football, on the grounds of East Broadway Elementary School, in Lucas County.

McClain admits to shooting the victim, J.B., but claims that he acted in self-defense. The following evidence was offered at McClain's trial.

{¶ 3} Eric Wagner and Christopher Yenrick operate King of the Mud Flag Football League, and both testified at trial. On the morning of October 15, 2023, Wagner and Yenrick were checking players and fans into the game near the entrance gate to the field. This process included a cursory bag check for weapons, which had been a problem in the past. This was the only point-of-entry onto the field, which was fully enclosed by an eight-foot fence. Yenrick helped Wagner with check-in until he left to referee the 9:00 a.m. game.

{¶ 4} Sometime during the first game, Yenrick yelled to Wagner that J.B. had "punched" and "attacked" McClain, along the sideline of the playing field. Yenrick, who was still refereeing, asked Wagner to eject J.B. from the field for fighting. So, Wagner left his post near the gate to retrieve J.B., who was about 30 or 40 yards from the gate, and escorted him off the field.

{¶ 5} According to Wagner, McClain then "attacked [J.B.] from behind and then had a gun in his face." Wagner elaborated, "I was standing right next to him. There was just three of us, like kind of in a triangle. And I told. . . [McClain], you don't want to do this; you don't want to do this. And by the time I said it the third time, the gun went off," striking J.B.

{¶ 6} After the shooting, the gun "hit the ground" and Wagner grabbed it, while McClain and J.B. engaged in a fistfight. As the two fought, Wagner took the

2

gun to his car to disarm it and called 911. As he was removing the clip from the weapon, McClain approached the car and demanded his gun back, which Wagner refused. Wagner eventually turned the gun over to the police.

{¶ 7} Toledo Police Patrolman David Talkington and his partner were dispatched to the school and told that the "suspect was fleeing in [a silver truck]," which they encountered as they entered the school parking lot. Officer Talkington instructed the driver to stop and to exit the vehicle. After talking to the driver for a few minutes, the officer began to check the vehicle for weapons and "located" McClain lying down in the back seat. McClain was taken into custody.

{¶ 8} J.B. sought treatment at a nearby hospital, where he was treated for a gunshot wound, described as a "through and through" to the back of the neck. Detective Shawn Conklin interviewed J.B. at the hospital. J.B. told the detective that he recognized the shooter from previous flag football games, but he did not offer a name and had no more involvement in this case. J.B. did not appear at trial, despite being subpoenaed.

{¶ 9} McClain testified in his own defense, as did his friend, Albert Scott. Each recalled standing along the sideline of the playing field and watching a professional football game that McClain was live-streaming on his phone. According to Scott, as they were looking at McClain 's phone, with their "heads. . . down," J.B. "shows up, steps in front of Mr. McClain [and] tells him [']you better get from around here.[']" J.B. said those words a second time and then "cocks back and full fledge just hits [McClain] all across his lips, his face area."

3

{¶ 10} McClain testified that he "wasn't expecting" to be hit, and he felt "stunned and shocked" by the punch. When McClain "look[ed] up," he saw the perpetrator "rais[e] his mask above his head" and saw that it was J.B., whom he recognized from playing flag football over the years. After punching McClain, J.B. brandished a gun "from his waistline" and pointed it at McClain. McClain was the only witness to testify that J.B. brandished a handgun during the assault.

{¶ 11} McClain offered no further details regarding what J.B. did with the alleged gun after pointing it at him. When asked what happened "next," McClain testified that, "[J.B.] [was] escorted out" by others, specifically by Wagner, Scott, and "a crowd of people," who "flow[ed] to the exit."

{¶ 12} Albert Scott walked off the field with J.B., and he recalled that the two got "closer and closer to each other" as "a crowd. . . behind" them instructed Scott to "chill out" and to "get away from J.B. [because] [y]ou got a daughter." According to Scott, when J.B. exited the field, he retrieved some personal items from a car and then returned to the gate, where everyone had "converged."

{¶ 13} Meanwhile—as J.B. was being escorted off the field—McClain was "grabb[ing]" his belongings near the sidelines, before following the others toward the gate. Once McClain exited the field, he "met" up with J.B. again. According to McClain, J.B. called him "the N word" and "the B word" and threatened to "do something to harm" him. After J.B. "said one more thing," McClain "swung on him," causing J.B. to "stagger[]" and "drop all his belongings out." After dropping his belongings, J.B. "turned

around to face [McClain], and that's when [McClain] drew the firearm." In McClain's own words:

[W]e're standing about . . . five, six feet apart. [J.B.] starts to walk toward me with one open hand and one hand on his waistline, but in that moment I'm in control of the situation, but knowing that he just pointed a gun at me and knowing that it's on his person, I'm in control of the situation, but [J.B.] takes two steps closer and throws a punch toward the firearm. . . [M]y arms weren't fully extended more to his neck area and the firearm goes off.

{¶ 14} After the shot was fired, the gun hit the ground, and the two "tussle[d]. . . in a fistfight." Once they were separated, McClain announced, "I'm leaving" and asked for a ride from a friend with the silver truck. McClain admitted that he laid down in the truck to avoid detection from the police.

{¶ 15} Following a two-day trial, the jury found McClain guilty of felonious assault, in violation of R.C. 2903.11(A)(2) and (D), a felony of the second degree, plus a gun specification, in violation of R.C. 2941.145(A), (B), (C), and (F). The trial court convicted McClain and ordered him to serve an indefinite term of a minimum of seven (7) years to a maximum of ten and one-half (10.5) years in prison. In its March 29, 2024 journal entry, the trial court ordered that the sentence be served consecutively to the sentence imposed in case No. CR21-2545, for a total aggregate term of 10 to 13.5 years

in prison.  It also imposed a mandatory term of post-release control of 18 months to three

3 years and the costs of supervision, confinement, and prosecution.

{¶ 16} McClain appealed.  He raises three assignments of error for our review:

I. The State of Ohio did not prove beyond a reasonable doubt that

Appellant did not act in self-defense, such that his conviction for felonious

assault was against the manifest weight of the evidence.

II. The medical records of the victim who did not appear at trial were

not properly admitted into evidence.

III. The trial court committed reversible error when it ordered

appellant to pay all or part of the applicable costs of supervision,

confinement, and prosecution, but without finding that appellant had the

ability to pay the discretionary costs.

## II.  Law and Analysis

### A.  The jury's rejection of McClain's self-defense claim was not against the manifest weight of the evidence.

{¶ 17} In his first assignment of error, McClain argues that the state failed to

disprove that McClain acted in self-defense.

{¶ 18} As an initial matter, we note that McClain does not challenge the

sufficiency or weight of the evidence supporting the offense of felonious assault or the

attached gun specification.  McClain only argues that the state failed to disprove his self-

defense claim beyond a reasonable doubt.  *See State v. Griffin,* 2024-Ohio-5846, ¶ 13 (6th

Dist.), quoting *State v. Petway,* 2020-Ohio-3848, ¶ 46 (11th Dist.) ("The elements of the

crime and the existence of self-defense are separate issues. . . Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged.”).

{¶ 19} There are two types of self-defense in Ohio: (1) defense against danger of bodily harm, also known as non-deadly force self-defense; and (2) defense against danger of death or great bodily harm, or deadly force self-defense. *State v. Rice*, 2022-Ohio-3291, ¶ 58 (7th Dist.). In this case, McClain alleged that J.B. brandished a gun during the skirmish along the sideline and later, during the second altercation, J.B. placed “one hand on his waistband,” suggesting that he had a weapon “on his person.” Accepting those allegations as true, McClain articulated a claim of defense against danger of death or great bodily harm. *See, e.g. State v. Grant*, 2023-Ohio-2720, ¶ 69 (3d Dist.), quoting *State v. Dale*, 2013-Ohio-2229, ¶ 15 (2d Dist.) (“The use of a gun constitutes the use of deadly force.”).

{¶ 20} A person may use deadly force in self-defense when he or she (1) “‘was not at fault in creating the situation giving rise to the affray’”; (2) “‘had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force’”; and (3) “‘did not violate any duty to retreat or avoid the danger.’” (Brackets omitted.) *State v. Wilson*, 2024-Ohio-776, ¶ 20, quoting *State v. Messenger*, 2022-Ohio-4562, ¶ 14. “Because each element must exist for a self-defense claim to prevail, the [S]tate can defeat a self-defense

7

claim by disproving any one of these elements beyond a reasonable doubt." *State v. Knuff,* 2024-Ohio-902, ¶ 191.

{¶ 21} In *State v. Messenger*, 2022-Ohio-4562, the Ohio Supreme Court clarified the burden of proof where a defendant asserts a claim of self-defense under the version of the statute that became effective March 28, 2019. That is, "R.C. 2901.05(B)(1) triggers the State's duty to disprove self-defense so long as 'there is evidence presented that tends to support that the accused person used the force in self-defense'"—a burden that is not all that heavy. *Id.* at ¶ 20, 22 ("The reference in R.C. 2901.05(B)(1) to 'evidence presented that tends to support' self-defense indicates that the defendant's burden of production is not a heavy one and that it might even be satisfied through the state's own evidence."). As such, "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25. "[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden," and the State must then disprove self-defense. *Id.* In that case, "the sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Id.* at ¶ 26. The State's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal. *Id.* at ¶ 27.

8

{¶ 22} In evaluating a manifest weight challenge involving self-defense, we must review the entire record, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice with respect to its finding that the state disproved at least one of the elements of self-defense beyond a reasonable doubt. *State v. Gibson*, 2023-Ohio-1640, ¶ 12 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 23} Here, McClain produced sufficient evidence, by way of his own testimony, that tended to show that he acted in self-defense when he committed the offense of felonious assault, i.e. when he shot J.B. That is, McClain testified that, in the moments before the shooting, J.B. walked toward him "with one open hand and one hand on his waistline," which McClain perceived as a threat, "knowing that J.B. had just pointed a gun at [him] and knowing that [the gun is] on his person." McClain alleged that if he had not "pull[ed] his firearm. . . J.B. would [have] shot him."

{¶ 24} Viewing the evidence in the light most favorable to McClain, we find that a rational trier of fact could find all the elements of a self-defense claim. *Accord State v. Palmer,* 2024-Ohio-539, ¶ 29-30 (Defendant presented legally sufficient evidence to support a claim of self-defense where he testified that victim "came up on [him] . . . faster than lightening," that defendant feared victim "was going to kill him" and that he did not know whether victim had a weapon). Therefore, McClain satisfied his initial burden of production. The burden then shifted to the State to disprove self-defense by establishing beyond a reasonable doubt that McClain (1) was at fault in creating the situation giving

9

rise the affray; or (2) that he did not have reasonable grounds to believe or an honest belief that he was in imminent danger of death or great bodily harm; or (3) that he used more force than was reasonably necessary to defend against the imminent danger of death or great bodily harm. *Id.*

{¶ 25} Because it is dispositive of McClain's self-defense claim, we will confine our analysis to the first element of self-defense, i.e., whether McClain "was at fault in creating the situation giving rise to the affray * * *." *State v. Mitchell*, 2023-Ohio-2604, ¶ 19 (1st Dist.), citing *Gibson* at ¶ 11. "[T]he first element of a self-defense claim provides that the defendant must not be at fault in creating the situation that gave rise to the affray. This concept is broader than simply not being the immediate aggressor. A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense." *State v. Elam,* 2022-Ohio-1895, ¶ 14 (12th Dist.), citing *State v. Nichols*, 2002 WL 126973, *3 (4th Dist. Jan. 22, 2002).

{¶ 26} First, we address McClain 's argument that we "should find that Mr. McClain was not at fault in creating the situation giving rise to the affray." In essence, McClain asks this court to reweigh the evidence. But, as set forth above, that is not the function of the appellate court. Rather, our role is to determine whether the jury's verdict was contrary to the manifest weight of the evidence in finding that the state proved beyond a reasonable doubt that McClain was at fault in creating the situation giving rise to the affray. We find that the verdict was not against the manifest weight of the evidence.

10

{¶ 27} Next, McClain argues that he was not at fault because J.B. attacked him "without provocation," which was "corroborated" by those who "escorted [J.B.] off the field."

{¶ 28} Missing from McClain's argument is any discussion about the *second* confrontation—which was when the shooting occurred. At trial, McClain conceded that there was "another altercation," and the jury heard testimony that "a couple minutes" elapsed between the two events. During those minutes—while J.B. was being escorted off the field—McClain gathered up his belongings, including his weapon, and traversed the length of the field, a distance of "about 50 yards." By McClain's own testimony, "[a]s soon as" he exited the field, he "met" J.B., "swung" at him and then drew his weapon and shot him. McClain offered no evidence that J.B. was armed at the time, even if he did have "one hand on his waistline" as he claimed.

{¶ 29} Despite recent amendments to the law of self-defense in Ohio, "the law continues to prohibit a person from provoking an assault or voluntarily entering an encounter and then claiming a right of self-defense." (Citing cases.) *State v. Ward,* 2023-Ohio-3641, ¶ 41 (1st Dist.). Indeed, "[o]nce the 'person against whom the defensive force is used' is no longer. . . a threat, or when the defendant has succeeded in 'expelling' the other person, then the privilege under which defendant operated is over." *State v. Koehler*, 2014-Ohio-3922, ¶ 23; (8th Dist); *see also, State v. Nichols*, 2002 WL 126973 (Jan. 22, 2002, 4th Dist.) (defendant followed the victim to provoke an altercation); *State v. Sekic*, 2011-Ohio-3978, ¶ 15 (8th Dist.) (defendant cannot claim self-defense when he

"willingly advanced toward a volatile situation" by confronting the victim to continue an earlier altercation); *State v. Gaston*, 2013-Ohio-2331, ¶ 16-17 (8th Dist.) (even if the victim is the immediate aggressor, the defendant cannot provoke an assault or voluntarily enter an encounter and then claim a right of self-defense after the victim predictably attacks); *State v. Johnson*, 2022-Ohio-2577, ¶ 13 (8th Dist.) (defendant's conduct could not support a self-defense claim where undisputed evidence demonstrated that defendant waited for the victim to exit the building and approached the victim with the intent to rekindle the earlier fight).

{¶ 30} In this case, the evidence established that any threat posed by J.B.—at the time he assaulted McClain near the sideline—diminished the further he moved away from McClain and the more time that passed. Indeed, there are no facts to indicate that J.B. had to be forcibly removed or otherwise resisted his escort by a league official. Thus, by the time J.B. exited the field, he no longer posed any threat to McClain. Therefore, McClain was not using "defensive force" when he followed J.B. off the field and shot him. The evidence supports the jury's finding that McClain voluntarily rekindled the earlier fight after the threat, i.e. J.B., had been removed.

{¶ 31} Although McClain denies that he pursued J.B. off the field—i.e., he claims that he left the playing field because, under league rules, "once they see a fight or any altercation, you have to leave whether you started it or not"—the jury was "free to believe some, all or none of each witness's testimony and [to] separate the credible parts of the testimony from the incredible parts." *State v. Greer,* 2023-Ohio-103, ¶ 41 (6th

12

Dist.). Moreover, McClain is hard-pressed to establish himself as a rule-follower given that he knowingly brought a gun to the flag football game, which was against league rules.

{¶ 32} We find that the trial court's rejection of McClain's self-defense claim was not against the manifest weight of the evidence because, based upon the testimony and evidence presented, a reasonable factfinder could have found that McClain was at fault in creating the situation giving rise to the affray. The state was only required to disprove one of the three elements of self-defense in order defeat McClain's self-defense claim. *Knuff*, 2024-Ohio-902, at ¶ 191. As in *Knuff*, McClain's self-defense claim "collapsed" once the jury found that he was at fault in creating the situation. *Id.* at ¶ 195-196.

{¶ 33} We therefore find McClain 's first assignment of error not well-taken.

**B. The trial court did not commit plain error in admitting hospital records.**

{¶ 34} In his second assignment of error, McClain argues that the trial court erred in admitting hospital records related to J.B.'s visit to the emergency room. The records, identified as state's exhibit 5, were admitted during the testimony of Detective Conklin, who interviewed J.B. in the emergency room after the shooting.

{¶ 35} At trial, McClain objected to the admission of the records on the basis that the custodian of the records was not present to testify, in violation of McClain's constitutional right to confrontation. The state countered that the records were self-authenticating under R.C. 2317.422 ("Qualification of records of hospital"). Indeed, where hospital records are "properly certified" under the statute, "[n]either the preparer

13

nor the custodian is required to testify." *State v. Spikes,* 67 Ohio St.2d 405, 407 (1981) (Noting that, because the statute "expressly provides that the parties may call witnesses to testify about the records," it preserves a party's confrontation right under both the federal and state constitution); *see also State v. Roberson,* 2017-Ohio-4339, ¶ 97 (6th Dist.) (Where hospital records are properly endorsed and certified by a qualified representative in accordance with 2317.422(A), "no further authentication is needed for them to be admissible."). After examining the records in this case, the trial court determined that the state had complied with R.C. 2317.422 and admitted them.

{¶ 36} On appeal, McClain does not challenge that finding. Instead, he argues that the records improperly "came in" under the business records exception to the hearsay rule. *See* Evid.R. 803(6). Specifically, he complains that the records were admitted "as a package," without any "discussion" or "critical review" of the records' "medical significance."

{¶ 37} First, we disagree with McClain that the "records came in" under Evid.R. 803(6). According to the transcript, there was no discussion regarding what hearsay exception, if any, applied to J.B.'s hospital records. And, although the records were properly *certified* under R.C. 2317.442(A), that provision "does not make inadmissible evidence admissible." *State v. Cast,* 2022-Ohio-3967, ¶ 17 (12th Dist.) quoting *State v. Johnson*, 1987 WL 33778, *2 (2d Dist., Dec. 30, 1987). Here, the records were admitted without objection at trial.

14

{¶ 38} Because McClain did not object to the admissibility of the records at trial, the trial court did not have the opportunity to address the issue. "Arguments raised for the first time on appeal are generally barred." *State v. Deanda*, 2021-Ohio-3774, ¶ 33 (6th Dist.), quoting *State v. Talley*, 2021-Ohio-2558, ¶ 22 (6th Dist.). Otherwise, a party could "hold their arguments in reserve for appeal, thus evading the trial court process." *Id.* Crim.R. 52(B), however, carves out an exception to this general rule which permits review of an argument for "plain error" even though the argument was "not brought to the attention of the court." As a result, McClain has waived all but plain error review of his second assignment of error. *State v. Diar,* 2008-Ohio-6266, ¶ 89.

{¶ 39} "Plain error" is an error that affects an appellant's substantial rights. Crim.R. 52(B). "An error that affects substantial rights is one that affected the outcome of the proceedings." *State v. Rink,* 2021-Ohio-1068, ¶ 10 (6th Dist.), citing *State v. Barnes,* 94 Ohio St.3d 21, 27 (2002). "Plain error should be found only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *State v. Hill,* 92 Ohio St.3d 191, 203 (2001).

{¶ 40} McClain has failed to identify the existence of plain error in this case. Indeed, McClain alleges that "the admission of medical records" was, at most, only "potentially . . . prejudicial." McClain identifies no particular record within the exhibit, much less explain how any of the records actually prejudiced him.

{¶ 41} We therefore find McClain's second assignment of error not well-taken.

15

## C. The costs of confinement were imposed in error.

{¶ 42} In his third and final assignment of error, McClain argues that the trial court erred when it imposed the costs of confinement and supervision, without considering whether he has the ability to pay.

{¶ 43} The costs of supervision and confinement are discretionary costs. Pursuant to R.C. 2929.18(A)(5)(a) ("Financial sanctions"), a trial court "*may* sentence the [felony] offender to any financial sanction * * * including the following: (i) [a]ll or part of the costs of implementing any community control sanction, including a supervision fee under section 2951.021 of the Revised Code; (ii) [a]ll or part of the costs of confinement under a sanction imposed pursuant to section 2929.14, 2929.142, or 2929.16 of the Revised Code." (Emphasis added.) This court reviews a challenge to the imposition of costs under R.C. 2853.08(A)(4) and (G)(2)(b) to determine whether it was contrary to law to impose such costs. *State v. Velesquez,* 2023-Ohio-1100, ¶ 6 (6th Dist.). [1]

{¶ 44} Before addressing whether the imposition of discretionary costs in this case was contrary to law, it is necessary to note that McClain was sentenced to prison, not community control. Under 2951.021(A)(1), a trial court may impose costs of supervision on a felony offender sentenced to a *community control* sanction. Because McClain was

---

[1] McClain does not challenge the trial court's imposition of the costs of prosecution, which are mandatory under R.C. 2947.23(A)(1)(a). ("In *all* criminal cases, * * * the judge or magistrate *shall include* in the sentence the costs of prosecution * * * and render a judgment against the defendant for such costs.") (Emphasis added.); *see, e.g., Velesquez* at ¶ 7.

16

sentenced to a term of prison and not community control, the costs of supervision are not applicable here. *State v. Eaton,* 2020-Ohio-3208, ¶ 33 (6th Dist.) ("The costs of supervision are not at issue in this case because a prison term was imposed."); *accord Velesquez* at ¶ 12 ("Costs of supervision are not applicable in this case because [the defendant] was sentenced to prison."). This leaves only the costs of confinement to be resolved.

{¶ 45} "Costs of confinement must be imposed on the record at the sentencing hearing and in the judgment entry." *State v. Ali,* 2024-Ohio-486, ¶ 8 (6th Dist.), citing *State v. Henderson*, 2023-Ohio-4576, ¶ 17 (6th Dist.). Moreover, before imposing the costs of confinement, the trial court must consider whether the offender has, or reasonably may be expected to have, the ability to pay these costs. R.C. 2929.19(B)(5). Where the trial court fails to impose costs of confinement at the sentencing hearing, it may not add those costs in its judgment entry. *Henderson* at ¶ 16-17.

In its brief, the State acknowledges that it "was unable to find any reference to costs of confinement during the verbal imposition of sentence." Upon review of the March 27, 2024 sentencing transcript, we concur that the trial court did not impose the costs of confinement at that time, nor did it make any findings with regard to McClain 's ability to pay. However, the court did impose the costs of confinement in its March 28, 2024 judgment entry, along with a finding that McClain has, or reasonably may be expected to have, the means to pay those costs.

17

{¶ 46} "Where courts fail to address discretionary costs at the sentencing hearing, but includes imposition of costs within the sentencing entry, we have consistently found the imposition of costs to be contrary to law, and vacated the portion of the judgment imposing discretionary costs." *Ali* at ¶ 10, quoting *Henderson* at ¶ 16, citing *State v. Wymer,* 2019-Ohio-1563, ¶ 14 (6th Dist.); *see also State v. Patterson,* 2024-Ohio-2198, ¶ 13 (6th Dist.) ("Because the trial court failed to impose costs of confinement at the sentencing hearing, it could not add those costs to the judgment entry."); *State v. Temple*, 2019-Ohio-3503, ¶ 13 (6th Dist.); *but see State v. Fisher,* 6th Dist. Lucas No. L-22-1150, 2023-Ohio-2088, ¶ 34 (affirming imposition of discretionary costs, despite trial court's failure to address them at sentencing hearing because information in PSI supported a finding of offender's ability to pay).

{¶ 47} For the above reasons, we find that the trial court's imposition of the costs of confinement was contrary to law.  Therefore, we find McClain's third assignment of error well-taken, in part, but not well-taken with respect to the costs of supervision, which were not ordered in this case.  We hereby reverse and vacate only that portion of the judgment entry that imposes costs of confinement but affirm the judgment in all other respects.

### III.  Conclusion

{¶ 48} After our review of the entire record, we conclude that the jury did not clearly lose its way or create a manifest miscarriage of justice when it found that the State proved beyond a reasonable doubt that McClain did not act in self-defense when he

18

committed the offense of felonious assault against the victim in this case. Similarly, we find that the trial court did not commit plain error in admitting the victim's hospital records at trial. Therefore, we find McClain's first and second assignments of error not well-taken.

{¶ 49} McClain's third assignment of error is found well-taken, in part. The portion of the trial court's March 28, 2024 judgment that requires McClain to pay the costs of confinement is hereby vacated. The remainder of the judgment is affirmed. The parties are ordered to split the costs of this appeal pursuant to App.R. 24. It is so ordered.

Judgment affirmed, in part,
and reversed and vacated, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.       _____
                      JUDGE
Christine E. Mayle, J.

Myron C. Duhart, J.      _____
CONCUR.               JUDGE

               _____
                      JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.