[Cite as *State v. Lewis*, 2025-Ohio-2178.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                   Court of Appeals No.  L-23-1289

    Appellee                                 Trial Court No.  CR0202301264

v.

Christopher Lewis                          **DECISION AND JUDGMENT**

    Appellant                                Decided:  June 20, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Sarah Anjum, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from the judgment by the Lucas County Court of Common Pleas, which sentenced appellant, Christopher M. Lewis, to an indefinite prison term of four to six years for felonious assault, plus a mandatory three years for the firearm specification, plus 180 days for aggravated menacing, after a jury convicted him of those offenses. For the reasons set forth below, this court affirms the trial court's judgment.

**{¶ 2}** Appellant sets forth the following five assignments of error:

1. The trial court committed plain error in its instructions to the jury on self-defense/defense of others, violating Mr. Lewis' right to a trial by jury under Ohio Const., art. I § 10 and U.S. Const., amend. XIV.
2. Defense counsel was ineffective for failing to object to the incorrect self-defense/defense of others instruction in violation of Mr. Lewis' rights under U.S. Const., amend. VI; U.S. Const., amend. XIV; and Ohio Const., art. I § 10.
3. Defense counsel was ineffective for failing to develop and present evidence of Appellant's PTSD and traumatic brain injury to assert self-defense/defense of others at trial and in mitigation at Sentencing in violation of Mr. Lewis' rights under Ohio Const., art. I § 10; U.S. Const., amend. VI and; U.S. Const., amend. XIV.
4. Mr. Lewis' convictions as to both counts were not supported by sufficient evidence in violation of his due process rights under the U.C. Const., amend. XIV and Mr. Lewis' rights under U.S. Const., amend. VI; U.S. Const., amend. XIV and Ohio Const., art. I § 10.
5. The verdict as to each count was against the manifest weight of the evidence.

## I. Background

**{¶ 3}** On February 22, 2022, a Lucas County Grand Jury indicted appellant on one count of felonious assault, a violation of R.C. 2903.11(A)(1), and a second-degree felony under R.C. 2903.11(D), and one count of aggravated menacing, a violation of R.C. 2903.21(A), and a fourth-degree felony under R.C. 2903.21(B). Each count added a firearm specification under R.C. 2941.145(A), (B), (C), and (F). Appellant entered not-guilty pleas, and the matter proceeded to a jury trial. Prior to trial, appellant filed a notice of intent to assert self-defense. At the start of trial appellee, the state of Ohio, amended the aggravated menacing indictment down to a first-degree misdemeanor and dismissed its attached firearm specification.

2

{¶ 4} During the three-day trial, the jury received testimony from nine witnesses, and the trial court admitted 15 exhibits into evidence without objection. Witness testimony was provided by four Toledo police officers and detectives, the victim, the victim's teenage son, appellant's next-door neighbor, appellant's wife, and appellant. The admitted exhibits included body-worn camera videos by the Toledo police officers, home-security videos from appellant's residence and a neighbor's residence, the victim's medical treatment records, the SplatRBall toy gun photographed at the scene, and the 0.22-caliber semiautomatic pistol also retrieved from the scene. To summarize, appellant responded to a teenage prank, called a ding-dong ditch, with a violent assault on a man who had nothing to do with the prank. After deliberations, the jury convicted appellant of all offenses.

{¶ 5} The evidence admitted at trial divide the incident, which lasted about 20 minutes, into five sub-events: (A) the ding-dong ditch prank, (B) appellant's response to the pranksters, (C) appellant's acts towards the victim and the victim's son, (D) the police investigation, and (E) appellant's self-defense claims.

### A. The Ding-Dong-Ditch Prank

{¶ 6} At about 9:15 p.m. in the evening on Saturday, February 4, 2023, in Toledo, Lucas County, Ohio, appellant was at home with his wife where both were resting on couches. There was either a loud knock or a pounding at the front door that startled them, but no one was there when appellant opened the door. This is commonly known as a harmless ding-dong-ditch prank performed by teenagers. Appellant and his wife each

3

testified that they had participated in ding-dong-ditch pranks when they were teenagers, but it had never previously been done to them at their house.

{¶ 7} Appellant's home-security application on his mobile phone alerted appellant before the loud knock/pound at the front door. His own home-security video from inside the house showed that due to the alert, appellant watched on his phone a lone teenage boy wearing a hoodie approach the front door, perform the knock/pound, and then run away.

{¶ 8} The teenage boys[1] who performed the ding-dong-ditch prank at appellant's house drove off in a car and performed the same prank at the nearby house of the victim and his son.[2] The victim and appellant, although neighbors, did not know each other. When the victim looked, there was no one at the door or outside the window, but he saw a car drive away. When this happened again, the victim understood the ding-dong-ditch prank was underway because some of his son's high school baseball teammates had done it the year before.

{¶ 9} When it happened the previous year, the victim testified "they ended up coming up and then we caught them, and we all started laughing, you know." So, to have some fun, the victim asked for his son's SplatRBall toy gun, which resembles the shape of an automatic rifle, is made of plastic, is painted black, red and gray with an orange tip so others see it as a toy, and shoots gel-filled balls. Then the victim and his son waited for

---

[1] The number of teenage boys involved in the prank is unclear. The victim's son thought there might have been two or three. Appellant thought there were four or more.
[2] Appellant lives at 6109 W. Benalex Dr. The victim and his son live on the same side of the street at 6031 W. Benalex Dr. The houses are five houses apart.

4

the return of the pranksters between parked cars in their driveway. But the teenage boys did not perform the prank again.

### B. Appellant's Response to the Teenage Pranksters

{¶ 10} While the victim and his son waited outside, they saw the prankster's car pass and then at some point heard the loud sound of glass shattering from the direction of appellant's house. Both the victim and his son believed the prankster's car was in an accident. Because baseball teammates were involved, they immediately decided to investigate what happened. According to the victim, "never in a million years would I think somebody would actually smash out somebody's window like that. So I hundred percent thought they crashed into the tree, hit something, hit somebody's car. So that's what we're doing when we start walking." While they were walking up West Benalex Drive, which had no sidewalks, the victim's son received a video chat from a prankster in the car and learned that appellant just smashed the car's windshield with a pole. The victim was incredulous: "[I]mmediately I'm like, hey, what's [the] f***ing problem, they're kids."

{¶ 11} In addition to the videos, appellant's next-door neighbor[3] witnessed appellant's conduct outside his house: "I had a clear view from my front porch. . . . I didn't have to move to see what happened." The next-door neighbor explained his first observations: "My son and I had stepped out the door to have a cigarette on the front

---

[3] 6117 W. Benalex Dr. is next door to appellant's house and six houses from the victim's house. Appellant's and the next-door neighbor's houses are located on the horseshoe curve of W. Benalex Dr.

5

porch, and Mr. Lewis was in the front yard yelling, you know, at what appeared to be nobody. Then as I was looking around, I didn't see anybody around, and I yelled over, what's going on. He said somebody beat on his door."

{¶ 12} The pranksters circled around the neighborhood and passed appellant's house. The next-door neighbor knew the pranksters were just kids, not adults, because the taunting voices repeatedly saying, "What did you say? What?" sounded like teenagers about his grandson's age. The verbal taunts made no threats to appellant or his wife, and then they took off around the block again. The next-door neighbor told appellant, "[D]ude, just if you're so mad just go in the house and call police, you know, it's a ding-dong ditch, let it go. . . . I said, they're kids, you know, wild and having a little fun, you know." He watched appellant go in his garage and exit with "a long pole, probably I'd say 4 foot long" and then wait for the pranksters to return.

> Well, by that time he was still pretty hot from the first three times around, and me and my son didn't have any luck reaching him on that anger level, and when the boys came around and got to about right here, he said, "[O]h, s***, there they are." And when they got up into about the front of my house right about there, he left the yard, and the boys had spotted him coming at [them] with the club in his hand, and they started backing up, and they went up over the curb and almost hit the tree. . . I didn't want to see anybody get hurt. But when he got to the car, the boys couldn't go anywhere. So they had to go forward cause if they would have went backwards they would have hit the tree. So, they started coming forward and almost hit Mr. Lewis because he had gotten close to their car at that point in time, and he backed off of it and swung the club around and hit the taillight area of the car and broke it. And then they yelled something, I don't know exactly what, little chaotic, and he had gotten on the side of the car running by it and swung the club and hit the windshield of the car on the passenger side and broke the windshield, and I believe got the pole stuck in the glass. . . . And then he may have slipped and fell, and the boys

6

made it up the road. By that time I was little kind of blown away at what happened[.]

{¶ 13} Appellant admitted that after the pranksters left with the smashed windshield, he went into his house and retrieved a 0.22-caliber semiautomatic pistol. Both appellant and his wife testified the pistol was hers, was kept readily available in the house, and they believed it was fully functioning. The next-door neighbor further observed that, "[appellant] kind of walked out to the end of his property at the street and kind of just stood there like almost waiting for them to come back again cause they had already come back like four times. But they didn't."

## C. Appellant's Attack on the Victim

{¶ 14} The streetlights were all working. The video evidence and witness testimony corroborated that while the victim and his son walked up the street to investigate the smashed-glass sound, the victim held the toy gun either by his side or pointed down, and appellant came towards them to confront them. To the next-door neighbor, the toy gun in the victim's hand was clearly a toy. Appellant began verbally abusing the victim and his son with profanity while holding the pole in his hand.

{¶ 15} The victim and his son stopped walking, and the victim responded with his own profanity that the pranksters were just kids and what is appellant's "f***ing problem." Appellant then dropped the pole and pulled out the 0.22-caliber semiautomatic pistol and pointed it at the victim and his son. The next-door neighbor heard the victim tell appellant "I'm just coming down to tell you what's going on. I didn't do nothing." While confronted by appellant's pistol, the victim informed appellant the SplatRBall gun

7

was a toy, told appellant he was putting the toy down, put the toy down, and began backing away with his hands up. Nevertheless, appellant followed the victim with the pistol raised.

{¶ 16} The victim's son fled for safety towards another neighbor's house whose home-security video was played for the jury.[4] Appellant's pistol tracked the victim's son as he fled. Appellant returned his attention to the victim, who tried to flee to his house. Appellant chased the victim and when he overtook him, kept his finger on the pistol's trigger[5] while he put it against the victim's head. Appellant then proceeded to repeatedly strike the victim on his head and ribs with the pistol, even after the victim was on his knees for protection, while spewing profanities, such as "You want to play f***ing games?" and "You come with a fake gun. I don't give a f***!". A police body-worn camera video recorded appellant boasting that when a person is "defenseless," that is when you "come in." After the victim sought medical attention, the victim and the state prosecutors learned he had a severe head laceration requiring staples, headache, chest and back pain, and closed fractures of multiple ribs.

---

[4] The neighbor's house to which the victim's son fled was 6046 W. Benalex Dr., which is on the opposite side of the street and between the victim's house and appellant's and the next-door neighbor's houses. It is two houses from the victim's house and four houses from appellant's house.

[5] The police officers testified that the pistol was improperly loaded with a backwards first bullet in the magazine and during the assault was essentially a "paperweight." Appellant, however, admitted he did not know the pistol's functioning was compromised.

{¶ 17} Appellant's physical attack on the victim only ended after the next-door neighbor intervened:

> Well, I knew he hit him with something, but at the time that the first two or three blows came I was on my front porch. When that happened I said, what the f***. My son said, dad, stay out of it, that's a gun, and I said, I ain't staying out of that, I ain't letting that happen. . . . : I know [the victim] was bleeding at the blood coming down from the side of his head. There was blood coming down from the side of his head. . . . Chris was pretty angry, and so when he like pulled it together a little bit . . . I helped [the victim] up off the ground. He was shaking, and I said, go on, kid, go on home, buddy, go on, get going, and I kind of stopped Chris from following him down, and then the police were coming down the street.

{¶ 18} Video evidence corroborated that the victim did not fight back, which the victim explained was because he feared appellant would shoot him or his son. The video evidence also corroborated that as the victim retreated, appellant chased him with his pistol pointed at the victim's head and demanded to know, laced with profanity, if his parents were awake or home. The victim took all of this to mean appellant intentionally wanted to point a pistol at, and to beat, a defenseless child.

### D. The Police Investigation

{¶ 19} Two uniformed Toledo police officers were the first responders, and then two more arrived as backup. Three of those officers testified at the trial, and their body-worn camera videos were played for the jury. The police officers were dispatched on a weapons call, so they arrived in marked police cars in haste with lights and sirens. One officer testified, "In this situation we arrived on scene. I witnessed a male holding another male at gunpoint. So I then drew . . . my department issued firearm and told him to put the gun on the ground." Appellant complied.

9

{¶ 20} The officers then retrieved both the pistol appellant laid down and the toy gun already on the ground, which they all testified was clearly a toy. The police officers confiscated and photographed appellant's pistol at the scene as evidence of appellant using it to assault the victim. According to one officer, "When we were retrieving the weapon to take in as evidence, I noticed that right here would be what I determined to be hair from the victim's head when he was struck with the butt of the pistol. . . . Because the defendant was in possession of the firearm when we got on scene." And the hair caught in the pistol was more consistent with the victim's longer hair than appellant's short hair. Although the police officers did not confiscate the toy gun, they photographed it, which was admitted into evidence. "[W]e didn't keep it because, one, not illegal, and also there really wasn't of any evidentiary purposes to be had with it."

{¶ 21} The police officers separated appellant from the victim for interviews. "From the body camera, what the defendant stated was that [the victim] put his -- the toy gun down and at that point he was defenseless. So, yes, I would say that the victim was defenseless at that time [of appellant's attack]." Appellant never mentioned to the police that he acted in self-defense of himself or of his wife. Upon further questioning, the police determined that appellant had initiated the attack on the victim. The victim was transported to a nearby hospital for treatment.

{¶ 22} A Toledo police detective testified at trial that he was assigned the case on February 6, 2023, when the victim and his wife came to the police station about appellant's assault on the victim. The detective investigated further by interviewing

appellant, canvassing neighbors, obtaining videos, and reviewing the medical records that confirmed the extent of the victim's injuries for serious physical harm. The detective filed the complaint for felonious assault against appellant on February 8.

**E. The Self-Defense Claim**

{¶ 23} After the prosecution rested its case at trial, appellant's wife testified that on the evening of February 4, 2023, the ding-dong-ditch prank startled her. Although the home-security video depicted her calmly going to the kitchen, she decided to call for help:

> I called 911 because I was concerned. I wasn't sure if they were coming to hurt us. I wasn't sure if they were coming to rob us. I wasn't sure if it was a hate crime because we have Trump, Back the Blue, and Marine Corps everywhere. Our house is very patriotic, and I was scared. I didn't know what was going on.

{¶ 24} Appellant's wife remained on the phone with 9-1-1 until the police arrived. She saw a car swerve towards appellant and cause him to break the windshield. She heard the next-door neighbor yell at appellant: "My husband was walking up to the house. As he approached the patio, there was a scream or a yell, said, '[H]ey, motherf***er, what's your f***ing problem, what did you break their windshield for.'" After appellant retrieved the pistol from the house, appellant responded "yeah, '[W]hat's your problem,' [and] walked out to the street." Then she described the confrontation in the street:

> I told the 911 operator, I said, '[H]ere comes two men,' and she said, '[W]hat are they doing.' I said, '[T]hey're walking down here,' and I repeated what they said. And I don't remember what Chris and him said, but then my husband said, '[H]e has a gun.' I said, '[M]a'am, he has a gun, he has a gun, like you need to get here right away.' I don't know what's going on. . . . The two men kept walking towards each other. My husband

told him to put his gun down. And the guy said, '[O]h, this is a toy.' I do remember him saying that. My husband said, '[W]ell, put it down, mine is real, put it down.' And then they kept walking, and my husband kicked it out of his hand.

{¶ 25} Appellant's wife admitted that after the victim no longer had the weapon, appellant pointed his pistol at the victim.

{¶ 26} Appellant then testified in his own defense. After he and his wife were startled by loud banging at his front door, he jumped up to look out. He saw two individuals in his driveway by his truck and two by a car parked on the street in front of his home. He yelled at them, "What do you guys want. I am going to get vulgar. . . . I did say I'm going to have sex with his mom, that is what I said, yes." He then said the teenagers yelled back at him, "' [N]one of your f'ing business.' I'm like, what do you guys want, who are you[.]" He told them to leave, and they did.

{¶ 27} The car returned about 30-seconds later with the teenagers yelling, "'What, what, b****, what, what.' I'm like, like what do you guys want." He ran after them without shoes, and they left again. He ran back to his house for shoes when he also "grabbed a paint stick." Appellant then "walked out to my truck -- my intention was to walk out to the truck and ask them to leave me, leave me the F alone, leave me the f*** alone. . . . I don't want to hurt anybody, but leave me alone." The car passed by again.

> And I turn around and there's that car with no headlights on. Scared the living snot out of me. . . "What the f*** do you want. Leave me alone." And I'm going to tell you right now in Crocs on ice you cannot run. Did I go towards them like leave me alone, yes. They went in reverse. Looks like they hit the curb about 5 feet away. . . They -- you could tell they dropped it down and they floored it and they turned on their headlights. . . . And, you know, if you go from a dark to bright, your eyes kind of, you know, you

12

kind of do that jerk, and I looked up and they swerved at me. I had two choices, put my shoulder in the windshield or use the stick to move away. I used it as we'll call it a pivot point. . . . And then pushed away, and the mirror hit me in the process, and I fell down and got up.

{¶ 28} Appellant knew he broke the car's windshield, and he saw the car leave in the direction of the victim's home. He turned to return to his home and heard the next-door neighbor yell profanities at him, "Hey, mother***er, why did you break their windshield." Then, "I saw two individuals walking down with, you know, hoodies, hoodies on, and I saw something -- someone in the front had something in their hand." He did not know at the time it was the victim, a grown man, and the victim's son, a teenager. "Well, [the victim] screamed, '[Y]eah, I'm talking to you, mother***er,' and I go, '[S]o you want to play, too.' I just got hit by a car. I don't know what's going on. Are people attacking my house? I don't know if it's my military background. I want to protect my wife and my family." Appellant chose to be what he called "a distractor" and deliberately go towards the people walking up the street: "I don't know what's going on. It's out of control. There's -- is this guy coming to shoot my wife. . . . So I'm the distractor. I need to get out here so nobody goes to kill my wife because I will sacrifice."

{¶ 29} As described by appellant, "When I turned the corner, I had my paint stick in my hand. Alls I saw was an AR-15 in my face. . . . Once I saw the AR, I panicked. . . . I feared for my life. I'm dead." He said the victim carried his AR-15 with his finger "by the trigger." He admitted the victim "said first . . . '[M]y gun is fake.' . . . [H]e's proceeding towards me. . . . I threw my stick down, I pulled the 0.22 out, and I said '[P]ut your gun down now.'" He said the victim did not comply, so he kicked it out of the

13

victim's hand. Even though the victim was defenseless, appellant proceeded to put his pistol in his left hand.

> Q. What were you doing with your right hand?
> A. I was hitting [the victim].
> Q. You hit him with your elbows also?
> A. Yes.

{¶ 30} While appellant was striking the victim, he said the victim's son charged him, but denied pointing his pistol at the boy to stop the charge. Appellant continued his assault on the victim until the next-door neighbor interfered. "I heard him screaming in the background. I had [the victim] contained . . . at that time. The son was running around. I didn't know if he was going to grab the assault rifle. . . So I'm trying to control that, and I'm waiting for the [prankster's] car. I hear [the next-door neighbor say] '[G]et off of him, stop.' . . . [He] came over, and we let [the victim] up. And I started to hear police sirens."

{¶ 31} Despite the police sirens, appellant was not done with the defenseless victim.

> I looked over, saw [the victim's son] over here at a neighbor's house. So I knew that was secure. And [the victim] and I jumped up and I started walking ahead of him, 7 to 10 feet, and he's like '[W]here you going.' Or I said to him, '[W]hat are you doing, where are you going.' I don't know if you're going to grab another gun and come after my wife and I. I don't know who you are. . . [The victim said,] 'Well I live over here.' I don't know this.

{¶ 32} Contrary to the video evidence and police testimony, appellant recounted, "As soon as I saw the police, . . . I sat the pistol down next to the curb, walked

14

approximately 7 to 10 feet away, and got on my knees. . . . And put my hands up. . . . And the officers drew their guns on [the victim] and chased him over."

{¶ 33} At the close of trial, appellant's counsel sought, and the trial court granted over appellee's objection, an extensive self-defense jury instruction that included both deadly and non-deadly force scenarios. The jury deliberations ensued, and the jury convicted appellant of both felonious assault with the firearm specification, a second-degree felony, and aggravated menacing, a first-degree misdemeanor. Later, the trial court sentenced appellant to serve an indefinite prison term of four to six years for felonious assault, plus a mandatory three years for the firearm specification, plus 180 days for aggravated menacing. Appellant timely appealed.

## II. Ineffective Assistance of Counsel

{¶ 34} We will address appellant's first and third assignments of error together.

{¶ 35} Appellant withdrew his second assignment of error in his reply brief and at oral argument by conceding his trial counsel had, in fact, objected to the disputed portion of the self-defense jury instruction given by the trial court.

{¶ 36} In support of his first assignment of error, appellant argues the trial court abused its discretion when it gave a specific type of self-defense jury instruction that was not identical to the model Ohio Jury Instruction. In support of his third assignment of error, appellant argues that his trial counsel was ineffective for failing to present evidence of appellant's self-identified post-traumatic stress disorder and traumatic brain injury in support of his self-defense claim.

15

## A. Presumption of Licensed Attorney's Competence

{¶ 37} An ineffective assistance of counsel claim must overcome the strong presumption that a properly licensed Ohio lawyer is competent. *State v. Hamblin*, 37 Ohio St.3d 153, 155-56 (1988). Appellant offers no evidence that his trial counsel was not licensed to practice law in Ohio, and his competence is presumed.

{¶ 38} To overcome his trial counsel's presumption of competence, appellant has the burden to show both: (1) deficient performance by his trial counsel below an objective standard of reasonable representation, and (2) a reasonable probability of prejudice that but-for her trial counsel's errors, the outcome would have been different, i.e., that a jury would not have convicted him of felonious assault and aggravated menacing. *Id.* at 156, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If appellant fails to meet either prong of the *Strickland* test, it is not necessary for us to engage in an analysis of the other prong. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), citing *Strickland* at 697.

## B. Deficient Performance

{¶ 39} For the first *Strickland* prong, appellate scrutiny of trial counsel's performance is highly deferential. *Id.* at 142, citing *Strickland* at 689. Debatable trial tactics generally do not constitute ineffective assistance of counsel. *State ex rel. Mango v. Ohio Dept. of Rehab. & Correction*, 2022-Ohio-1559, ¶ 24.

{¶ 40} Appellant's arguments for his trial counsel's ineffectiveness revolves around his claim of self-defense to the felonious assault and aggravated menacing

16

offenses. The jury received instructions for appellant's use of either deadly force or non-deadly force in self defense. However, appellant argues the following portion of the self-defense jury instruction violated his constitutional rights as going beyond the standard Ohio Jury Instruction: "A defendant claiming self-defense or defense of others admits the facts claimed by the prosecution and then relies on independent facts or circumstances to exempt him from liability." We disagree.

{¶ 41} This court has repeatedly held, "Self-defense is an affirmative defense whereby the defendant, in essence, admits to the facts of the state's case but offers additional facts that justify or excuse the defendant's use of force." *Maumee v. Yeager,* 2024-Ohio-858, ¶ 65 (6th Dist.); *State v. Sepeda*, 2022-Ohio-1889, ¶ 51 (6th Dist.); *State v. Fisher*, 2024-Ohio-5520, ¶ 42 (6th Dist.) ("Essentially, the defense of self-defense is one that does not negate the state's case, but instead presumes the state has established a prima facie case but nevertheless defeats the charge based on a legal avoidance of the charge."). The Ohio Supreme Court agrees. *State v. Martin*, 21 Ohio St.3d 91, 94 (1986), citing *State v. Poole*, 33 Ohio St.2d 18, 19 (1973).

> To support a claim of self-defense involving the use of non-deadly force, the defendant must prove, by a preponderance of the evidence, that: (1) he was not at fault in creating the situation giving rise to the altercation; and (2) he had reasonable grounds to believe and an honest belief, even though mistaken, that he was in imminent danger of bodily harm and his only means to protect himself from such danger was by the use of force not likely to cause death or great bodily harm. To support a self-defense claim involving the use of deadly force, in addition to the foregoing, the defendant must also prove, by a preponderance of the evidence, that he did not violate any duty to retreat or avoid the danger. Pursuant to R.C. 2901.09(B), a defendant does not have a duty to retreat so long as the defendant is in a place in which he lawfully has a right to be.

17

*Maumee* at ¶ 67.

{¶ 42} By admitting to using force against the victim, appellant does not also admit to intending to harm or to kill the victim to be entitled to a self-defense instruction, but he has the burden to show he intended to use the force he used to repel or escape the force inflicted by the victim. *State v. Wilson*, 2024-Ohio-776, ¶ 15-21. Under R.C. 2901.05(B)(1), appellant bore the initial burden of production, and, if successful, then the burden of persuasion shifted to appellee to prove beyond a reasonable doubt that appellant did not use his force in self defense. *State v. Carter*, 2024-Ohio-5031, ¶ 45 (6th Dist.). Appellee can defeat appellant's self-defense claim by disproving any one of the elements beyond a reasonable doubt. *State v. McClain*, 2025-Ohio-577, ¶ 20 (6th Dist.).

{¶ 43} At no point did any party dispute that the jury instructions repeatedly affirmed that appellee had the burden to prove beyond a reasonable doubt every element of each offense, and after appellant met the threshold for a self-defense jury instruction, appellee had to carry the beyond-a-reasonable-doubt burden on whether appellant did not act in self-defense to each offense. Contrary to appellant's argument, admitting or stipulating to the underling facts did not automatically mean appellee met its burden of persuasion to disprove appellant's self-defense claim and did not automatically prejudice appellant. As with all the facts introduced at trial, the jury, as the trier of fact, was in the best position to determine the weight and credibility of the evidence, including inconsistencies, along with witness manner and demeanor, and was in the sole position to believe or disbelieve all or any of the testimony presented at trial. *State v. Gunn*, 2021-

18

Ohio-2253, ¶ 41 (6th Dist.); *Wilson* at ¶ 21 ("the jury could believe or disregard when deciding whether Wilson acted in self-defense").

{¶ 44} The disputed jury instruction is consistent with the foregoing statement of the law on self-defense. In addition, appellant admits that the Ohio Jury Instructions are not binding on a trial court, citing *State v. Fork*, 2024-Ohio-1016, ¶ 21. Further, under the facts and circumstances of the case, we find no abuse of discretion by the trial court for giving the disputed portion of the self-defense jury instruction. *State v. Palmer*, 2024-Ohio-539, ¶ 16 (as applied to the refusal to give a requested jury instruction), citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989) (it is within the sound discretion of the trial court to determine whether the evidence presented at trial is sufficient to require a jury instruction).

{¶ 45} Appellant's first assignment of error is not well-taken.

{¶ 46} Appellant next argues for his third assignment of error that he suffers from "a neurocognitive and mental disorder," which he self-identified as post-traumatic stress disorder and a traumatic brain injury. Appellant argues his trial counsel was "catastrophically deficient" under American Bar Association standards for defense counsel for failing to introduce any expert testimony to educate the jury regarding appellant's "unique neurophysiology" with respect to the honest-belief prong of his self-defense claim to explain his extreme fear, and as mitigation at sentencing. Appellant points to the following portion of the sentencing transcript to argue the trial court understood "Mr. Lewis' brain injury as an aggravating factor":

19

Court: Well, Mr. Lewis, first off thank you for your [U.S. Marine] service to our country. That has to be acknowledged. You can be a good person in all other respects, but if you respond with violence and aggression to the normal frustrations of the world, then you're a danger to the community. You essentially beat who you thought was a kid that knocked on your door and ran away. It was an unacceptable level of violence, and you have a history of using an unacceptable level of violence. So, given all of that, I guess the only other thing I'd say is that I think [the victim's] actions in not elevating the situation might have saved a life.

You took a gun out to a child prank, and the video camera footage both from your Ring camera and the police was chilling because it appeared to me that you weren't afraid that night. You were exhilarated by it. You told the police, "When you're defenseless I'm coming in." And that level of aggression and violence is not acceptable in society. So despite all of the wonderful things that you've done in the community and your service to this country, your conduct is not acceptable, and I agree with [the prosecution] that I'm concerned that you don't even understand that what you did was wrong, that a ding-dong ditch doesn't equate – doesn't give you license to take a pole, hit someone's car, take a gun and pistol-whip the person that you think rang your doorbell, ran away, and maybe taunted you. It's just – it's unacceptable.

{¶ 47} We disagree there was a reasonable probability of prejudice against appellant that but-for his trial counsel's errors, the outcome would have been different, i.e., that a jury would not have convicted him of the offenses, due to the jury finding he acted in self-defense. As the trial court summarized at sentencing, the evidence showed that appellant made deliberate, violent choices against the victim that night in response to a knock on his door and verbal taunts by teenagers. In acknowledging appellant's criminal history using "an unacceptable level of violence," the trial court was not acknowledging appellant has a brain injury. Even if his trial counsel chose a different trial strategy by introducing expert testimony evidence to support that appellant had an honest belief of imminent danger, and even if the jury believed it, appellee still would

20

have defeated appellant's self-defense claim because appellant was at fault by creating the situation. Appellant brandished and used an actual, real pistol that led to the victim's injuries and led to his son's fear for his and his dad's safety.

{¶ 48} We do not find, under the first-prong of the *Strickland* test, a deficient performance by appellant's trial counsel below an objective standard of reasonable representation. We do not find that appellant met his burden by a preponderance of the evidence that his trial counsel's performance was ineffective. Appellant's third assignment of error is not well-taken.

### III. Sufficiency of Evidence

{¶ 49} Appellant's fourth assignment of error argues appellee failed to meet its burden to produce sufficient evidence to convict him of felonious assault and aggravated menacing because he did not act knowingly. Appellant argues he did not knowingly cause the victim serious physical harm, and he did not knowingly cause the victim's son to believe that he will cause serious physical harm within the meaning of R.C. 2903.21. In addition, appellant questions whether serious physical harm to the victim occurred "within the meaning of R.C. 2901.01(A)(5)" because the victim only received two staples to his head "and later returned to an unnamed medical provider, where he was diagnosed with rib fractures, but was still able to work and breathe."

{¶ 50} "The test for sufficiency of the evidence is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime proven beyond a reasonable doubt.'" (Citation omitted.) *State v. Worley*, 2021-Ohio-2207, ¶ 57.

{¶ 51} With respect to the elements of felonious assault, R.C. 2903.11(A) states, "No person shall knowingly . . . cause serious physical harm to another." Under R.C. 2901.01(A)(5)(d), "serious physical harm" includes "any physical harm that involves . . . some temporary, serious disfigurement." Under R.C. 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." Under R.C. 2941.145(A) for the firearm specification in the indictment, appellee must show "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶ 52} Appellant admitted to dropping his "paint stick," pulling out a "real" pistol, and holding the "real" pistol in his left hand while repeatedly striking the victim with his right hand in a manner that caused the victim's injuries, including two staples for head lacerations and fractured ribs. The videos and the next-door neighbor's testimony corroborate that appellant announced he "beat the f***" out of the defenseless victim.

> Q. So you - - okay. [The victim] has two staples and a nice large laceration on the top of his head. Did you cause that?
> **A.** I would assume.
> Q. Is there any doubt that you caused that?
> A. When I was hitting him with my elbows and my palm, I would assume I could have caused that, yes.
>  . . .

22

Q. You caused serious -- you knowingly caused serious physical harm to [the victim] that night; correct?

A. Knowingly, no.

Q. And you had a firearm in your possession, brandished it, and used it?

A. Brandished, yes,

. . .

Q. You beat the f*** out of [the victim] that night; didn't you?

A. I contained the situation, yes.

Q No. And in doing so you believed your perception was you beat the f*** out of him?

A. I did say that at one point; yes. With adrenaline flowing I did say that.

{¶ 53} With respect to the elements of aggravated menacing, R.C. 2903.21(A) states, "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, . . . or a member of the other person's immediate family." Appellant admitted to brandishing his pistol in front of the victim and the victim's son. The victim's son testified:

Q: Did Christopher ever point the gun at you?
A: Yes.
Q: Did he point it specifically at you?
A: Yes.
Q: Did he say anything when he did that?
A: I think he told me to back away.
Q: Okay. And did you?
A: Yes.
Q: Why?
A: I felt fear for my life.
Q: Were you afraid for your dad, too?
A: Yeah.

{¶ 54} Based on the foregoing, we find that sufficient evidence was submitted to the fact-finder such that, after viewing the evidence in a light most favorable to appellee,

23

any rational trier of fact could have found the essential elements of the crimes of felonious assault with a firearm specification and aggravated menacing.

{¶ 55} Appellant's fourth assignment of error is not well-taken.

### IV. Manifest-Weight of the Evidence

{¶ 56} In support of his fifth assignment of error, appellant argues his convictions should be reversed because "the record clearly supports that each conviction is against the manifest weight of the evidence." Appellant argues that when viewed from his perspective, the jury lost its way in finding that appellant did not act in defense of himself and/ or his wife. Appellant saw two dark figures carrying an automatic weapon approached him after "four people he initially saw when he responded to the disturbance, the same four people he believes were in the darkened vehicle that struck him." He honestly feared he and his wife were under attack.

{¶ 57} "To evaluate a manifest-weight claim, we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of all the witnesses." *State v. McKelton*, 2016-Ohio-5735, ¶ 328. We must decide if the jury clearly lost its way in resolving conflicts in the evidence to create a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered. *Id.* A manifest-weight claim questions the effect of the evidence in inducing belief of appellant's guilt by questioning whether the jury could find the inclination of a greater amount of credible evidence was admitted at trial to sustain that decision than not. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The discretionary power to grant a new trial is in the

24

exceptional case in which the evidence weighs heavily against the conviction. *Id.* The unanimous concurrence of all three judges of a court of appeals panel is required to overturn, on the weight of evidence, a judgment that results from a jury. *Id.* at 389. Appellant does not meet his burden.

{¶ 58} In light of the testimony and evidence previously discussed, we find that any rational fact-finder could have found the inclination of a greater amount of credible evidence was admitted at trial than not to induce the fact-finder's belief of appellant's guilt for the offenses. We find no exceptional instance from the record where the evidence admitted at trial weighs heavily against the conviction. Just because appellant and his wife testified they feared for their safety, and that appellant's use of force that day was in self-defense, does not mandate the fact-finder believe them. Appellant did not inform the police he feared for his and his wife's safety to prompt his use of force in self-defense, and the video and witness evidence did not corroborate his claim of acting out of such fear. We find the admitted evidence supports inducing a fact-finder's belief of appellant's guilt that appellant knowingly caused the victim serious physical harm with the presence of a firearm and knowingly caused the victim's son to believe that appellant will cause serious physical harm to him or his dad. We do not find the jury clearly lost its way in resolving conflicts in the evidence to create a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered.

{¶ 59} Appellant's fifth assignment of error is not well-taken.

## IV. Conclusion

**{¶ 60}** On consideration whereof, the judgment of the Lucas County Court of

Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant

to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Thomas J .Osowik, J.         _____
                                                                    JUDGE

Christine E. Mayle, J.

                                           _____

Myron C. Duhart, J.                                       JUDGE
CONCUR.

                                           _____
                                                                    JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.